UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID J. CARPENTER,<br><br>             Petitioner,<br><br>     v.<br><br>RON DAVIS, Warden of California State Prison at San Quentin,<br><br>             Respondent. | Case No. 98-cv-02444-MMC<br><br><br>**ORDER DENYING REMAINING GROUP 4 CLAIMS**<br><br><br>**DEATH PENALTY CASE** |

## INTRODUCTION

The instant case arises from petitioner's conviction and death sentence for the first degree murder and attempted rape of Ellen Hansen ("Hansen"), the attempted murder of Steven Haertle ("Haertle"), and the first degree murder and rape of Heather Scaggs ("Scaggs"). *See People v. Carpenter*, 15 Cal. 4th 312 (1997). The crimes were committed in Santa Cruz County in 1981; following a change of venue, however, the case was tried in Los Angeles County in 1984.[1] On April 28, 1997, the California Supreme Court affirmed petitioner's convictions and sentence on direct appeal. *See id*. Petitioner's subsequent certiorari petition to the United States Supreme Court was denied on January 20, 1998.

Petitioner filed his first state habeas petition on December 24, 1996; it was denied by the California Supreme Court on May 27, 1998. Prior to the denial of his state habeas petition,

---

[1] Following his trial in Los Angeles County, petitioner was tried in 1988 in San Diego County, where he was convicted and sentenced to death for five murders that were committed in Marin County in 1980. *See Carpenter*, 15 Cal. 4th at 344 n.1.

petitioner filed in the United States District Court for the Central District of California a request for the appointment of federal habeas counsel and a motion for change of venue. On June 12, 1998, petitioner's change of venue motion was granted and the above-titled action was transferred to the Northern District.

Under the one-year limitation period set forth in 28 U.S.C. § 2244(d), petitioner's federal habeas petition was due by May 27, 1999. The Court, however, granted petitioner's motion to equitably toll the statute of limitations for five months, to and including October 27, 1999. *See* Order Den. Mot. to Vacate and Grant. in Part and Den. in Part Mot. for Equitable Tolling (Dkt. No. 76), at 38.[2] Subsequently, on October 22, 1999, petitioner filed in this court his Petition for Writ of Habeas Corpus,[3] a Notice of Additional Claims, and a Motion to Hold Proceedings in Abeyance. That same date, petitioner filed in state court a second state habeas petition, which, on December 1, 1999, the California Supreme Court denied. On December 6, 1999, petitioner filed his First Amended Verified Petition for Writ of Habeas Corpus ("First Amended Petition" or "FAP") and withdrew the Motion to Hold Proceedings in Abeyance.

Respondent subsequently filed a Motion to Dismiss First Amended Petition, in which motion respondent primarily asserted various procedural grounds for dismissal of certain portions of petitioner's First Amended Petition. The Court addressed all of the procedural issues in a series of orders.

In 2008, based on allegations in the First Amended Petition and the applicable law, the Court issued an order pursuant to *Rohan ex. rel. Gates v. Woodford*, 334 F.3d 803, 817 (9th Cir. 2003), *abrogated by Ryan v. Gonzales*, 568 U.S. 57 (2013), requiring petitioner's competency be determined in a timely manner. Based on the case record and the examination report of a stipulated expert, the Court found petitioner competent to pursue his habeas claims.[4]

---

[2] In the same order, the Court denied petitioner's request to toll the statute of limitations on his unexhausted claims to a date thirty days from an order identifying unexhausted claims. *See id.*

[3] Because petitioner filed his federal petition after April 24, 1996, the date on which the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") went into effect, those provisions apply to the instant proceedings. *See Lindh v. Murphy*, 521 U.S. 320 (1997).

[4] Petitioner appealed to the Ninth Circuit certain of the Court's orders regarding the

The parties subsequently met and conferred, and agreed to a briefing schedule to address the remainder of petitioner's claims, which schedule, *inter alia*, organized the claims into nine separate groups.[5]  In earlier orders, the Court denied Claims 19, 20, 22, 25, 26, 27, 28, 29, 30, 31, 42, 43, 44, 46, 48, 49, 50, 51, 52, 54, 55, 56, 58, 59, 62, and 63.  The instant order addresses Group 4 claims 9B, 9D.1, 9E, 9F, 9G, 9H, 9I, 9J, 9L, 9M, and 24.  For the following reasons, these claims likewise will be denied.

## FACTUAL BACKGROUND

The relevant facts are set forth below.

## I. Guilt Phase Evidence

### A. The Hansen/Haertle Crimes

On March 29, 1981, Hansen and Haertle, then students at the University of California, Davis, were camping at Henry Cowell Redwoods State Park ("Henry Cowell Park") in the Santa Cruz Mountains.  At approximately 4:00 p.m., they went for a hike.  Hansen and Haertle visited the observation deck, then walked along the Ridge Trail toward the Cathedral Redwoods.  Approximately one mile from the observation deck, they met a man, later identified as petitioner, walking in the opposite direction.  They passed each other without speaking.  Hansen and Haertle continued to the Cathedral Redwoods, and, after a few minutes, decided to retrace their steps to return to their campsite.  As they walked back along the Ridge Trail, they again encountered petitioner.  Haertle described the scene at trial:

> [Petitioner] said, "'Oh, we've met again,'" and then pulled out a black revolver [with a brown grip].  He pointed the weapon at [Hansen and Haertle] and ordered, "'Do what I say.'"  Haertle put his hands up until [petitioner] told him to put them down.  [Petitioner] told the two, "'Do what I say.  You won't get hurt.'"  Haertle warned Hansen, "'Be careful, Ell.  He's got a gun.'"  [Petitioner] gestured at Haertle and told him to go down the trail.  Haertle stepped backwards, then heard Hansen say, "'Don't listen to him, Steve.  Don't listen [to] what he says.'"  Haertle pleaded with [petitioner] to let them go.  [Petitioner] told them, "'Now, listen to me

_____

competency determination, which appeal was dismissed and denied in an unpublished memorandum issued July 31, 2009.

[5] For purposes of efficiency, the Court subsequently amended the schedule in part.

3

and do what I say.'" He approached the two and, looking at Hansen, said, "'I want to rape you.'"

Hansen responded, "'No, I'm not going to let you.'" Haertle advised her, "'Ellen, stay away from him, he has a gun.'" [Petitioner] ordered them to "move towards the bushes off the side of the trail," and gestured with his gun. They "both stayed away from the gun. As the gun moved [them] over to the edge of the trail, [they] went towards the edge of the trail." Haertle started to lose his footing, "and then shots went off." Haertle "felt like somebody hit [his] neck with a sledge hammer." He also felt something hit his right hand. The next thing Haertle remembered was "waking up lying on the ground."

Haertle observed Hansen "lying face down on the ground and her head was in a pool of blood." He "picked up Ellen's head to see if she was alive. She wasn't." He saw [petitioner] "across the trail with his back" to him. Haertle got up and, bleeding from the neck, fled towards the observation deck "as fast as [he] could."

*Carpenter*, 15 Cal. 4th at 345-46.

Leland Fritz and his son, Kenneth Fritz (collectively, "the Fritzes"), were also at Henry Cowell Park that afternoon. At approximately 5:00 p.m., they saw petitioner on the observation deck and briefly conversed with him. They described petitioner as occasionally peering toward the Ridge Trail with binoculars. Petitioner then left, walking onto the Ridge Trail. Two other campers, Fred ("Fred") and Maureen Morse ("Maureen") (collectively, "the Morses") also saw petitioner, and observed him get a drink of water at a fountain near the observation deck.

A few minutes later, the Fritzes and the Morses heard gunshots coming from the direction of the Ridge Trail. The Fritzes walked toward the direction of the shots and soon saw Haertle, who was wounded, fleeing toward them. Haertle told them what had happened and the Fritzes helped him to the observation deck, left him with the Morses, and went off to summon help. Maureen, a nursing assistant, applied first aid, while Fred went down the Ridge Trail to find Hansen. On his way down the trail, Fred saw a man, identified at trial as petitioner, who told him that someone had been shot along the trail. The man did not stop walking and continued moving away from the scene.

While Maureen was assisting Haertle, petitioner walked up the trail. Haertle stood up, pointed at petitioner, and told Maureen to "'get out of here'" because that was the man who shot him. *See id.* at 346. Petitioner continued walking "through the clearing . . . like he didn't see [them] or hear [Haertle] yelling." *See id.* Haertle fled to the campground and Maureen walked

4

down the trail to find Morse. Law enforcement officers arrived shortly thereafter but were unable to apprehend the shooter. Leland Fritz and a young girl in the area reported that they saw the shooter speed away in a red Fiat.

Hansen died of two gunshot wounds to the head and one to the right shoulder fired from close range. Haertle had been shot in the back of the neck and underwent surgery to have a bullet removed from behind the sternum.

### B. The Scaggs Crimes

Scaggs knew petitioner from their working together at a trade school in Hayward, California. Scaggs lived in San Jose, California, with her boyfriend. On May 2, 1981, she arranged to drive to Santa Cruz with petitioner in order to purchase a car from one of petitioner's friends. Her own car was inoperable. Scaggs wrote her boyfriend a note containing petitioner's name, address, and phone number. Scaggs left home that morning and did not return; she was not seen alive after that day.

The evening of May 2, 1981, Scaggs' friends contacted petitioner to try to find out what happened to her. Petitioner admitted he and Scaggs had planned to go to Santa Cruz together, but told them he overslept, had car trouble, and never saw her. A man purporting to be petitioner also called Scaggs' apartment later that evening and told one of her friends that he was worried about Scaggs because he did not pick her up that morning. A few days later, on May 8, petitioner told police the same thing, adding that he "just pray[ed] that nobody finds Heather's body, or that in fact she has been raped." (*See* 81 RT 11981.)

On May 24, 1981, hikers found a nude and badly decomposed body in mountainous, wooded terrain 136 yards off the roadway in Big Basin State Park in Santa Cruz County. Big Basin State Park is approximately twelve to fifteen miles from Henry Cowell Park. Dental records identified the body as Scaggs. The autopsy showed Scaggs died of a single gunshot wound to the right cheek. The shot had been fired from close range and the position of Scaggs' body was consistent with her having been shot from above while lying on the ground after intercourse. The pathologist who performed the autopsy found the vaginal tract contained a high concentration of seminal fluid with a large number of sperm, some of which had intact tails. The pathologist was

of the opinion that this evidence showed the sperm was deposited into the vagina near the time of death, likely within an hour of the gunshot wound, but possibly within a matter of minutes, and that the condition of the sperm inside the vaginal tract was consistent with Scaggs not getting up from the ground after the sperm was deposited. Forensic analysis of the semen was inconclusive as to blood type.

### C. Ballistics, Sightings, and Other Crimes

The prosecution also presented at trial the following evidence linking petitioner to the crimes:

Ballistics analysis established that a single gun, a .38-caliber Rossi revolver, was used to shoot Scaggs, Hansen, and Haertle. Documents and testimony established that Mollie Purnell, [petitioner's] friend, purchased the weapon in the fall of 1980. Purnell testified under a grant of immunity that she bought it at [petitioner's] request and gave it to him.[6] He paid for it. When she was first questioned by law enforcement agents after [petitioner's] arrest, Purnell said the gun had been stolen. [Petitioner] had told her to say that "if anything happened." Two other witnesses testified that defendant showed them a similar-appearing weapon in late 1980 and early 1981.[7] The police found the revolver buried under broken asphalt in a vacant lot in San Francisco. Shane Williams led them to it. Williams and his wife Karen, both bank robbers, testified that [petitioner] gave them the gun on May 13, 1981, shortly before his arrest. Shane used the gun in a bank robbery, then hid it in the vacant lot after [petitioner] was arrested.

The gunman who assaulted Haertle and Hansen was clean shaven. When arrested, [petitioner] wore a beard, which he had started to grow after that assault. Witnesses viewed him in a physical lineup in which all the participants were bearded. Pursuant to a court order, [petitioner] appeared clean shaven at trial. Haertle positively identified [petitioner] as his assailant at the lineup and in court. Leland Fritz also identified [petitioner] both at the lineup and in court. The girl who saw the red Fiat speed away from the crime scene identified a different person at the lineup, but [petitioner] in court. Kenneth Fritz and the Morses could identify no one at the lineup, but identified [petitioner] in court.

Haertle, the Morses, and the Fritzes generally described the gunman as wearing a distinctive gold jacket and a blue or green baseball cap. Candy Townsend

---

[6] In her testimony, Purnell explained petitioner provided her with a Traders Sporting Goods advertisement and told her which gun he wanted. Purnell further testified she did not believe, at the time, that purchasing the gun for petitioner would lead to a "dangerous situation" (*see* 84 RT 12436), and that she was "obligated to" petitioner because she owed him money and he had helped her in the past when she was out of work (*see id.*).

[7] One of the two witnesses was Tina Vance, *see infra* at 9, 19, 23.

6

[petitioner's former girlfriend] lived with [petitioner] in early 1981. She testified [petitioner] owned a green baseball cap. She had once worked at a bar in Billings, Montana, where she acquired a gold jacket that had "Oly" written on the front, and on the back, "Western Bar Olympic Drinking Team, Billings, Montana." At most only about 20 of these jackets existed. Townsend did not wear the jacket herself. [Petitioner] told her he was wearing it. She last saw it in one of [petitioner's] cars. After she last saw the jacket, around early April 1981, [petitioner] told her it had been stolen. A San Francisco police officer who issued [petitioner] a traffic citation on March 7, 1981, testified defendant was wearing a "yellow windbreaker" containing the logo on the front of either "Coors" or "Olympia beer." The jacket was never found.

Leland Fritz testified that the back of the gunman's jacket "said either 'Olympic' or 'Olympia,' either 'beer drinking champion' or 'team.' And I was sure of the 'Montana' that was underneath it." When shown a picture of a jacket that Townsend said looked like her jacket, Leland said it had the same "fancy lettering" as the gunman's jacket. The configuration of the writing was "pretty close" to that of the jacket. Other witnesses observed varying, but lesser, amounts of the writing on the jacket.

The evidence showed that [petitioner] owned two cars during this time, a Chevrolet station wagon and a red Fiat similar to the car that Leland Fritz and the girl saw speeding away. The day after the Haertle-Hansen shooting, [petitioner] drove the Fiat to the home of an acquaintance in Marin County, borrowed her car, and left the Fiat with her for four days. After [petitioner's] arrest, a paper bag containing an unexpended .38-caliber bullet was found in the Chevrolet. The bullet had characteristics similar to bullets used in the shootings.

Witnesses testified that the gunman who shot Haertle and Hansen wore tennis shoes. Criminalists took plaster casts and photographs of distinctive shoe tracks at the scene. Evidence showed that the day before the shooting, [petitioner] purchased a pair of Nike shoes with an identical pattern. The shoes themselves were never found.

*Carpenter*, 15 Cal. 4th at 347-48.

Additionally, the prosecution introduced the following evidence of other crimes:

In October 1980, Anne Alderson was fatally shot in the head from close range near the top of Mount Tamalpais in Marin County. The body was clothed, but the vagina contained sperm. A semen stain on the panties, probably deposited around the time of death, was of a type consistent with about 6 to 8 percent of the general population, including [petitioner]. In November 1980, Cynthia Moreland and Richard Stowers were fatally shot in the head in a heavily wooded area of the Point Reyes National Seashore. The .38-caliber Rossi revolver used in the Santa Cruz County crimes was also used on these occasions.

*Id.* at 348-49.

**D. Defense Evidence and Prosecution Rebuttal**

During his defense, petitioner did not dispute he was the gunman, but instead sought to cast doubt on whether he lay in wait for Hansen and Haertle and whether he raped Scaggs. A forensic serologist testified on petitioner's behalf that he conducted further testing and determined that the sperm found in Scaggs' vaginal tract could have come from her boyfriend, who had a similar blood subtype to petitioner; he conceded, however, that his findings would also be consistent with petitioner depositing the sperm. In addition, he estimated the sperm was deposited approximately twelve to thirty-six hours before Scaggs' death because, "if the semen was deposited just before death, [he] would have expected to find a much larger concentration" of seminal fluid and spermatozoa. (*See* 90 RT 13548.)

To counter the allegation that he was lying in wait for Hansen and Haertle, petitioner presented the testimony of his investigator, who testified that she visited the Henry Cowell Park observation deck and attempted to look down the Ridge Trail from that area. According to the investigator, the Cathedral Redwoods area, where Hansen and Haertle decided to turn back, was not visible from the observation deck even when she looked through binoculars. The investigator also testified that walking to the Cathedral Redwoods from the observation deck took approximately twenty-four minutes.

**II. Penalty Phase Evidence**

As aggravation, the prosecution presented significant details regarding petitioner's long and violent criminal history, which included a violent assault on one of petitioner's former coworkers, during which petitioner drove his coworker to a wooded area of the San Francisco Presidio, threatened her with a knife, hit her on the head with a hammer, and then attacked a deputy who came to her aid; the attempted rape and stabbing of a woman in another wooded area near Santa Cruz; the kidnapping, forcible rape, and robbery of another woman in the Santa Cruz Mountains; two separate robberies, in Daly City and in Calaveras County, respectively, in which women were tied up with rope; the kidnapping and rape of another woman in Calaveras County; petitioner's escape from custody after the Calaveras County rape; the murders of Cynthia Moreland ("Moreland") and Richard Stowers ("Stowers") at Point Reyes; the murder of Anne

Alderson ("Alderson") on Mount Tamalpais; and the murders of two female hikers at Point Reyes.

In addition, the prosecution presented the following witnesses: petitioner's ex-wife, who testified that, while petitioner was in custody for assaulting his coworker, petitioner told her she need not worry about him because he knew law enforcement's "games" and what they wanted to hear (see 112 RT 16573); Tina Vance ("Vance"), who testified she was fourteen years old when petitioner showed her a box containing a gun and ropes and proposed to set her up with some of his friends for a cut of the monetary proceeds; Robert Tanner ("Tanner"), a deputy sheriff, who testified he found a shoeprint and a damp spot that looked like someone had urinated next to the area where Hansen's body was found, which evidence the prosecution argued indicated petitioner returned to the scene after the Hansen/Haertle crimes and urinated on it; petitioner's former employer, who testified he saw petitioner shortly after the Hansen/Haertle and Scaggs crimes, respectively, and petitioner did not appear agitated or out of the ordinary; a psychiatrist who testified personality disorders do not cause criminal conduct and that petitioner's good behavior during some of the times he was institutionalized suggested he was able to control his behavior; a psychologist who testified there is, in general, no causal connection between sociological and/or psychological factors on the one hand and criminal conduct on the other, and that petitioner's criminal conduct was calculated and intentional; a speech pathologist who testified petitioner's stutter was not related to his abuse as a child and that no correlation exists between having a stutter and developing an anti-social personality; a state rehabilitation counselor who testified that, throughout the time period in which the charged crimes were committed, petitioner never appeared to be under any stress; petitioner's parole officer, who testified petitioner denied meeting Scaggs on the date of her disappearance but was "excited" and "almost exuberant" when he spoke about her (see 110 RT 16259); and several detention officers, all of whom testified petitioner caused difficulties in jail, often became very upset over small incidents, and once refused to go to court, leading other inmates to refuse as well.

In mitigation, petitioner presented the following evidence:

As summarized by appellate counsel[,] "the defense told [petitioner's] life story through a large number of lay and expert witnesses, who identified significant

themes: [petitioner] was the product of a physically and emotionally abusive home environment which left him with profound psychological impairments. He suffered from a severe speech impediment [stuttering] which exacerbated both the abuse and his psychological difficulties and contributed to his inability to overcome them. The social welfare, mental health, and criminal justice systems repeatedly recognized the type of intensive treatment [petitioner] needed, repeatedly failed to provide it, and instead consigned him to environments which actually reduced his already-limited ability to cope with life outside a highly structured institution. In contrast to his inability to adhere to societal norms while living outside of prison, [petitioner] adjusted extraordinarily well to prison life.

Several childhood friends and teachers testified about [petitioner's] troubled childhood, and other friends about his later years. His three adult children testified about their contacts with [petitioner] and their love for him. Several prison employees testified about [petitioner's] good behavior while incarcerated in state and federal prisons. An expert testified about the effects of child abuse in general and on [petitioner] in particular. Another testified about stuttering and its deleterious effects on [petitioner]. Dr. William Pierce, a psychologist, testified that defendant suffers from a severe and long-standing emotional disturbance amounting to a personality disorder stemming from emotional neglect and abuse in his childhood, which contributed to his criminal behavior. Dr. Craig Haney, another psychologist, testified that penal and other public institutions failed to provide necessary treatment for defendant, beginning when he was a minor, and that this failure contributed to his criminal behavior.

*Carpenter*, 15 Cal. 4th at 350.

## LEGAL STANDARD

Under AEDPA, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Review under § 2254 is limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011); *see also* 28 U.S.C. § 2254(d)(2).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and distinct meanings. *See Williams*, 529 U.S. at 404. A state court decision is "contrary to" Supreme Court authority, and thus falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *See id.* at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *See id.* at 413. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

On habeas review, the court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *See Williams*, 529 U.S. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409; *see also Harrington v. Richter*, 562 U.S. 86, 101 (2001) ("'[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law'") (emphasis in original) (internal quotation and citation omitted). Accordingly, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 88 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts." *Clark*, 331 F.3d at 1068.

Similarly, on habeas review, a state court's factual determinations are accorded deference. *See Pinholster*, 563 U.S. at 180-81. A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence

11

presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340 (citing § 2254(d)(2)); *see also id.* (holding state court's factual determinations "are presumed correct absent clear and convincing evidence to the contrary") (citing § 2254(e)(1)).

When a federal court is presented with a state court decision that is unaccompanied by a rationale for its conclusions, and there is no reasoned decision by a lower court, the court has no basis other than the record "for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context." *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000), *overruled on other grounds by Lockyer*, 538 U.S. 63; *cf. Wilson v. Sellers*, ___ S.Ct. ___, 2018 WL 1800370, at *3 (Apr. 17, 2018) (holding federal habeas court should "look through" the unexplained state-court decision to the last state-court decision "that does provide a relevant rationale"). In such situations, federal courts must conduct an independent review of the record to determine whether the state court decision is objectively unreasonable, and "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

Further, even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (internal quotation and citation omitted). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

## ANALYSIS

### I. Request for Deferred Ruling

In his briefing, petitioner requests judgment in his favor on Claims 9B, 9D.1, 9E, 9F, 9G, 9H, 9I, 9J, 9L, and 9M. Alternatively, as to Claims 9E and 9H, petitioner seeks a deferred ruling, on the asserted ground that the prejudice from his alleged *Brady* violations, *see Brady v.*

*Maryland*, 373 U.S. 83 (1963),[8] "cannot be looked at in isolation" (*see* Pet'r's Br. at 52) because Claims 9E and 9H "implicat[e]" his claims of cumulative error during the guilt and penalty phases (*see id.*). The Court concludes Claims 9E and 9H are not so closely intertwined with petitioner's claims of cumulative error that a decision on the former must be delayed pending a decision on the latter. The Court will rule on petitioner's cumulative error claims following briefing on those claims and will take all relevant filings into consideration in ruling on those claims at such time.

## II. Petitioner's Challenges to the Application of § 2254(d)

Petitioner contends the state court's failure to issue an "order to show cause" prior to its denial of his petition makes the standard of review mandated by § 2254(d) inapplicable to his petition. (*See id.* at 28.) Petitioner bases his argument on California's habeas scheme. In California, defendants who file a petition for a writ of habeas corpus must satisfy an "initial burden of pleading adequate grounds for relief." *See People v. Duvall*, 9 Cal. 4th 464, 474 (1995). Once a petitioner meets his initial burden, the California Supreme Court issues an "order to show cause," which, among other things, gives such petitioner a right to seek discovery and/or an evidentiary hearing. *See id.*

Characterizing California's "initial burden of pleading" as a requirement that petitioners make a "prima facie case for relief" (*see* Pet'r's Br. at 13), petitioner contends the state court, by its denial of his petition prior to issuing an order to show cause, effectively held he failed to establish a prima facie case for relief. Consequently, petitioner contends, the state court's determination that petitioner did not establish a prima facie case for relief constituted an unreasonable application of controlling federal law as well as an unreasonable determination of the facts. As petitioner's argument is essentially that his claims are meritorious, the Court will address such contention on a claim-by-claim basis in the merits section of this Order.

At the outset, however, the Court addresses petitioner's broad constitutional challenges to California's habeas procedure and the application of § 2254(d) to his petition.

_____

[8] In *Brady*, the Supreme Court held the prosecution's suppression of material evidence favorable to the accused violates due process. *See Brady*, 373 U.S. at 87.

13

### A. Supremacy Clause

Petitioner contends California's habeas pleading rules violate the Supremacy Clause because they increase the burdens of pleading federal constitutional claims in state court beyond the elements established by the Supreme Court. In support thereof, petitioner relies on two Supreme Court cases, namely, *Davis v. Wechsler*, 263 U.S. 22, 24 (1923), and *Brown v. Western Ry. Alabama*, 338 U.S. 294, 298-99 (1949). Both *Davis* and *Brown* concerned state laws or local practices that either barred or made difficult an individual's ability to assert federal rights. *Davis* involved a Missouri practice under which a substituted defendant, appearing in his official capacity as the current director of a federal agency, was deemed by such "appearance" to have waived a jurisdictional challenge raised by his predecessor under a general order. *See Davis*, 263 U.S. at 24-25. *Brown* involved a Georgia rule under which, on a demurrer, a complaint's allegations were to be construed "most strongly against the pleader." *See Brown*, 338 U.S at 295. In both cases, the Supreme Court, while acknowledging that a state or county is generally free to follow its own laws and practices, held such laws and practices cannot be allowed to defeat a plain and reasonable assertion of federal rights. *See Davis*, 263 U.S. at 24; *see also Brown*, 338 U.S. at 298-99.

Petitioner argues that California habeas law, in particular *Duvall*, imposes a presumption that the state court conviction is accurate, which unconstitutionally increases a California petitioner's burden of pleading federal claims. He interprets *Duvall* as applying presumptions "against finding a prima facie case" where a petitioner pleads federal constitutional claims. (*See* Pet'r's Br. at 29.) The Court is not persuaded.

In *Duvall*, the California Supreme Court stated that, "[f]or purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them." *Duvall*, 9 Cal. 4th at 474 (emphasis in original) (internal quotation and citation omitted). The California Supreme Court went on to describe the requirements for state habeas petitions, specifically, that such petitions must "state fully and with particularity the facts on which relief is sought" and must "include copies of reasonably available documentary evidence supporting the claim." *See id.* (noting "[c]onclusory allegations made

without any explanation of the basis for the allegations do not warrant relief" (internal quotation and citation omitted)).

Federal law is no different. It is undisputed that federal petitioners carry the burden of proving their claims, *see Richter*, 562 U.S. at 98, and on habeas review, federal courts, like California courts, presume a state court conviction is final and correct, *see Brecht*, 507 U.S. at 633 (noting, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence") (internal quotation and citation omitted); *see also Duckworth v. Eagan*, 492 U.S. 195, 210 (1989) (recognizing difference between rules applicable to direct review and those applied "to a presumptively final criminal judgment which is collaterally attacked in a federal habeas corpus proceeding") (O'Connor, J., concurring).

Petitioner also contends the California Supreme Court regularly violates the Supremacy Clause because, according to petitioner, it considers, for purposes of claimed error under *Brady*, the materiality of withheld evidence on an item-by-item basis, as opposed to collectively, as required by clearly established Supreme Court precedent. *See Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995). This argument likewise lacks support. *See In re Brown*, 17 Cal. 4th 873, 887 (1998) (explaining, "while the tendency and force of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively"); *see also In re Bacigalupo*, 55 Cal. 4th 312, 341 (2012) (holding, "[f]or purposes of assessing materiality, we must consider collectively all undisclosed evidence in order to assess its cumulative effect").

In sum, petitioner's arguments predicated on the Supremacy Clause are unavailing.

**B. Due Process**

Petitioner contends summary denial of his claims violated due process and the Fourteenth Amendment of the Constitution. Petitioner's argument is unpersuasive.

Under California law, if a habeas petitioner pleads "sufficient facts that, if true, would entitle him to relief," the court will issue an order to show cause, requiring a response from the state. *See Duvall*, 9 Cal. 4th at 475. Issuance of an order to show cause triggers the potential for discovery and an evidentiary hearing. *See id.* at 475-78. Petitioner asserts these procedures create a liberty interest enforceable under the due process clause, thereby entitling him to challenge, on

constitutional grounds, the state court's summary denial of his claims. Such assertion, however, cannot form the basis of a due process argument. "Process is not an end in itself[;] [i]ts constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). Consequently, "an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." *Id.* at 250 n.12.

Petitioner also argues it would violate due process for the Court to draw "hypothetical inferences of the state court" that were not raised during informal briefing. (*See* Pet'r's Br. at 31.) It is well established, however, that the review of the record under § 2254(d) is not limited to the legal and factual arguments made by the parties in the state court proceedings. Rather, "if there were *any* reasonable basis for the California Supreme Court to deny the . . . claim, habeas relief is unwarranted." *Reis-Campos v. Biter*, 832 F.3d 968, 974 (9th Cir. 2016) (emphasis added) (holding "habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision").

## III. Right to Counsel and Equal Protection

Petitioner next contends the California Supreme Court's summary denial of his petition violates his rights to counsel and to equal protection. Petitioner's argument is wholly lacking in both factual and legal support. Petitioner does not dispute that he had state habeas counsel when he filed his state petitions and he does not explain how summary denial of his petition violates either his right to counsel or his right to equal protection of the law.

## IV. Claim 9: *Brady* Claims

In Claim 9, petitioner argues that the prosecution violated *Brady* by failing to fulfill its constitutional obligation to disclose exculpatory and/or impeaching evidence to the defense. This claim, which contains multiple subclaims, was denied on the merits by the California Supreme Court in a summary opinion.

The Supreme Court, in *Brady*, held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," *Brady*, 373

U.S. at 87, and subsequently clarified that the duty to disclose such evidence applies even in the absence of a request, *see United States v. Bagley*, 473 U.S. 667, 683 (1985). Evidence is deemed favorable to the accused if it has either "exculpatory" or "impeachment" value. *See id.* at 676.

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles*, 514 U.S. at 434); *see, e.g., Wearry v. Cain*, 136 S. Ct. 1002, 1006-07 (2016) (reversing, based on *Brady* violation, where impeachment evidence as to key prosecution witnesses was suppressed; holding "[e]ven if the jury—armed with all of this new evidence—*could* have voted to convict [defendant], we have no confidence that it *would* have done so") (emphasis in original) (internal quotation and citation omitted). A reasonable probability of a total acquittal is not required to establish materiality; suppressed evidence is material if, had it been disclosed, there is a reasonable probability the defendant would have been convicted of a "different offense or a different degree of the crime." *See Shelton v. Marshall*, 796 F.3d 1075, 1085 (9th Cir.), *amended on reh'g*, 806 F.3d 1011 (9th Cir. 2015). Nevertheless, "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith*, 565 U.S. at 75. Moreover, the "mere possibility" that undisclosed information "might have helped the defense or might have affected the outcome of the trial" does not establish materiality under *Brady*. *See United States v. Olsen*, 704 F.3d 1172, 1184 (9th Cir. 2013) (internal quotations and citations omitted).

In sum, for a *Brady* claim to succeed, a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material, i.e., that prejudice ensued.[9] *See Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Strickler v.*

---

[9] For the purpose of review under *Brady*, "'material' and 'prejudicial' have the same meaning." *See United States v. Kohring*, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

*Greene*, 527 U.S. 263, 281-82 (1999).

**A. Claim 9B: Ammunition Log**

In Claim 9B, petitioner alleges the prosecution violated *Brady* by failing to disclose copies of an ammunition sales log for the dates surrounding Mollie Purnell's ("Purnell") purchase of the .38-caliber Rossi; in particular, petitioner contends the log, which does not reflect a sale of ammunition to Purnell, could have been used to impeach Purnell, who testified she purchased two boxes of ammunition from Traders Sporting Goods on September 13, 1980. Ballistics evidence showed the gun was used in the charged crimes and also in the Alderson and Moreland/Stowers crimes. Respondent argues petitioner has not shown suppression, favorability, or materiality.

First, respondent argues, petitioner did not adequately allege suppression because petitioner did not say in his state habeas petition that he was unaware of the ammunition log, and because he could have received the log in some manner outside of discovery. Petitioner did, however, incorporate by reference a declaration by one of his trial attorneys, Lawrence Biggam ("Biggam"), in which Biggam avers that petitioner's counsel "were not given [the ammunition log] in discovery, and did not otherwise see or review this log, or have any knowledge of its contents." (*See* Biggam Decl., App. 111 at 2); *see also In re Rosenkrantz*, 29 Cal. 4th 616, 675 (2002) (holding "[t]he various exhibits that may accompany the petition, return, and traverse do not constitute evidence, but rather supplement the allegations to the extent they are incorporated by reference"). Further, the log appears favorable to petitioner in that it calls into question Purnell's testimony that she purchased the ammunition on the same day she made a down payment for the gun. *See Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (holding "[a]ny evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes").

Nevertheless, as set forth below, petitioner fails to show the log was material. As noted, evidence is material if, had the evidence been introduced, there is a likelihood that the result of the proceeding would have been different such that confidence in the verdict is undermined. *See Cone*, 556 U.S. at 469-70.

Here, petitioner contends the log would have cast doubt on Purnell's overall credibility such that the jury would have disbelieved her story that she gave petitioner the gun. Purnell's

testimony was introduced primarily to show petitioner had access to the .38-caliber Rossi, which was used to commit the charged crimes and some of the uncharged crimes. Petitioner does not appear to dispute that Purnell purchased the gun, the remaining issues being whether she purchased it at petitioner's request and, most significantly, whether she thereafter gave it to him. Consequently, the absence of an entry bearing Purnell's name on a store's ammunition log is only tangentially related to the material facts in Purnell's testimony. To the extent petitioner contends the ammunition log would have discredited Purnell's general credibility, such evidence would have been cumulative given the other impeaching evidence introduced, namely, Purnell's concession that she was testifying under a grant of immunity and that she had previously lied to law enforcement by telling them the gun had been stolen.

Moreover, Purnell's testimony was not the only evidence linking petitioner to the gun she purchased. Shane and Karen Williams (collectively, "the Williamses") both testified that, shortly before petitioner was arrested, petitioner contacted them and offered the gun to them for use in their bank robberies, drove them to pick it up, and showed them how to use it. Their testimony regarding their trip to the warehouse was corroborated by federal agents, who testified they saw the Williamses with petitioner as they entered and exited the warehouse on the relevant date, and Vance testified petitioner showed her a black revolver that looked like the one presented by the prosecution at trial. Finally, Haertle testified that, at the time he and Hansen were shot, he "clearly" saw petitioner and the gun petitioner used (*see* 76 RT 11363) and, when shown the recovered gun at trial, testified it looked similar to the gun petitioner used to shoot him and Hansen, noting that the gun he saw at the time of the crimes was, like the one in court, a black revolver with a brown grip.

Further, the gun was not the only evidence connecting petitioner to the charged crimes, which, in addition to the evidence discussed above, included Haertle's testimony that he looked at petitioner's unobstructed face throughout the duration of the ordeal and observed at that time a number of petitioner's features, including his very arched eyebrows, hazel and blue-colored eyes, and "crooked" and "yellow" bottom teeth. (*See id.* 11402.) Also, along with identifying petitioner at a lineup, the preliminary hearing, a pretrial hearing, and again at trial, Haertle described the

perpetrator's unusual jacket, which description matched that of a jacket connected to petitioner by Candy Townsend as well as by a police officer who pulled petitioner over for a traffic violation in March 1981, the same month in which the Hansen/Haertle crimes were committed. Additionally, Leland Fritz, who identified petitioner at a lineup, placed petitioner's red Fiat at the scene of the Hansen/Haertle crimes.

As to the Scaggs crimes, the prosecution introduced evidence that, on the morning of Scaggs' disappearance, petitioner had arranged to pick her up, ostensibly to drive her to Santa Cruz in order to purchase a car from petitioner's friend, and that Scaggs wrote a note containing petitioner's address and phone number before leaving her apartment that morning. Moreover, petitioner's own words implicated him in Scaggs' disappearance; specifically, prior to the discovery of Scaggs' body in a wooded area in Santa Cruz, petitioner told law enforcement officers that he "pray[ed] nobody finds Heather's body, or that in fact she has been raped." (*See* 81 RT 11981.) As to the charged rape, the evidence showed Scaggs' vaginal tract contained sperm which, in the opinion of a prosecution expert, was most likely deposited near the time of death by her killer rather than consensually at some earlier time.

In short, the impeaching evidence on which the instant claim is based only "tugs at loose threads hanging from the margins of the [prosecution's] case," and in no manner challenges the "bulk of the evidence upon which the convictions rest." *See United States v. Sarno*, 73 F.3d 1470, 1506-07 (9th Cir. 1995) (holding evidence that is "marginal, ambiguous, cumulative, inadmissible, unreliable, inculpatory, irrelevant, or of negligible probative worth[] falls far short of" materiality).

Accordingly, Claim 9B will be denied.

**B. Claim 9D.1: Conjugal Visits**

While awaiting trial for several bank robberies, Shane Williams cooperated with law enforcement and turned over information regarding petitioner and his .38-caliber Rossi. Specifically, he told law enforcement that petitioner gave him the revolver and that he and his wife, Karen, buried the gun in an empty lot after petitioner was arrested for murder. He then directed police to the empty lot, where police recovered the gun. As noted, Shane and Karen Williams both testified against petitioner at trial.

In Claim 9D.1, petitioner argues that the prosecution violated *Brady* when it failed to disclose that it had provided a "substantial benefit," namely, "one or more conjugal visits" in the Santa Cruz County Jail in September 1981, in exchange for the Williamses' cooperation in petitioner's case.  (*See* FAP at 66-67.)  Respondent argues petitioner failed to make a prima facie showing that any conjugal visits occurred, that they were arranged by the prosecution, and that such evidence would be material.

In support of his contention that a conjugal visit was arranged by the prosecution, petitioner relies on the following: an excerpt from a Santa Cruz County Jail visitation policy, dated July 4, 1994, and revised July 26, 1996, which policy contains no mention of conjugal visits (*see* Santa Cruz County Jail Visitation Policy, App. 173); an unsworn letter from Karen stating she became pregnant in September 1981 "during a family visit in Santa Cruz County Jail" (*see* Letter of Karen Williams to Fed. Ct., App. 13), where Shane was being held awaiting his testimony at petitioner's preliminary hearing; and the birth certificate of Dalek Williams, the Williamses' son, recording his date of birth as June 1982 (*see* Birth Certificate of Dalek Williams, App. 14).

Petitioner fails to show a *Brady* violation.  Even assuming a conjugal visit occurred between the Williamses in September 1981, petitioner has failed to show any such visit was arranged by the prosecution, let alone to induce the Williamses to testify.  Although petitioner argues "there is no other way" the Williamses could have had a conjugal visit at the Santa Cruz County Jail (*see* Pet'r's Br. at 57), the only factual basis he provides for such assertion is the above-referenced visitation policy, which did not go into effect until more than ten years after the alleged conjugal visit(s) at issue occurred.  In any event, had the cited policy been in effect in 1981, an absence of a formal provision therein for conjugal visits does not suffice to establish that such visits were not in practice allowed.[10]  Given the limited factual support provided by petitioner, the California Supreme Court reasonably could have determined petitioner's theory was

---

[10] Although not relied upon by petitioner, the record also contains a declaration from defense counsel, stating that, "to his knowledge," conjugal visits were not allowed at the Santa Cruz County Jail.  (*See* Biggam Decl., App. 111 at 4.)  The declaration, however, lacks any factual foundation establishing counsel's knowledge of the Santa Cruz County Jail's visitation policies and practices, and thus is insufficient to show conjugal visits were disallowed.

no more than "supposition" and consequently lacked merit.  *See Runningeagle v. Ryan*, 686 F.3d 758, 770 (9th Cir. 2012) (denying petitioner's *Brady* claim where claim based on "inference and supposition"); *see also Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (reversing grant of habeas relief on *Brady* claim where claim based on "little more than speculation with slight support").

Even if petitioner had established that the alleged visit(s) were possible only as part of an exchange, he fails to establish materiality.  Citing *Banks v. United States*, 920 F. Supp. 688 (E.D. Va. 1996), petitioner argues conjugal visits were material because such information would have adversely affected the Williamses' credibility.  Petitioner's reliance on *Banks* is misplaced.  In *Banks*, the prosecution failed to disclose conjugal visits that had been arranged for an informant in exchange for his cooperation, which evidence the district court found both impeaching and material.  In contrast to the instant case, however, the informant in *Banks* was "vital to the prosecution's case as there was almost no other evidence available."  *See id.* at 693.  Here, as set forth above, there was ample other evidence tying petitioner to the charged crimes.

Moreover, as to the Williamses, the record already contained a considerable amount of impeachment evidence.  In particular, both Shane and Karen Williams testified at trial about their criminal activities and the favors they received from the prosecution in exchange for their testimony, including avoidance of murder charges that could have been based on their connection to the gun, "complete immunity" for Karen Williams' involvement in at least one of the bank robberies (*see* 84 RT 12583), and letters from the state prosecutor to Shane Williams' federal sentencing court, noting his cooperation in petitioner's case.  Given the other evidence of government favors, the evidence as to conjugal visits would have been, at best, cumulative.  *See Turner v. United States*, 137 S. Ct. 1885, 1894 (2017) (holding suppressed evidence not material where evidence was "largely cumulative of impeachment evidence petitioners already had and used at trial"; finding "cumulative effect" of withheld evidence did not undermine confidence in verdict); *see also United States v. Rodriguez*, 766 F.3d 970, 989 (9th Cir. 2014) (finding nondisclosure of impeaching evidence not material where witness's credibility already undermined).

Under such circumstances, the California Supreme Court reasonably could have concluded

22

1   petitioner failed to show a reasonable probability existed that, had the cited evidence been turned

2   over, the result of the proceeding would have been different.  *See Smith*, 565 U.S. at 75.

3          Accordingly, Claim 9D.1 will be denied.

4      **C.  Claim 9E:  Tina Vance's Navy Discharge**

5          Tina Vance testified during both the guilt and penalty phases.  In Claim 9E, petitioner

6   alleges that the prosecution violated *Brady* when it failed to provide him any information

7   regarding Vance's discharge from the Navy.  According to petitioner, Vance, shortly after

8   testifying at the guilt phase, received a general discharge from the Navy under honorable

9   conditions based on pre-service drug use.  Petitioner contends evidence of Vance's discharge was

10  exculpatory and material because Vance's underlying conduct involved moral turpitude and thus

11  went to her credibility.  Respondent does not dispute that the records were not turned over to

12  petitioner, but argues the discharge records belong to the Navy and, as such, were not under the

13  prosecution's control.

14         Petitioner again fails to show a *Brady* violation.  While prosecutors have a duty to disclose

15  impeachment evidence gathered by the prosecution team, *see United States v. Price*, 566 F.3d 900,

16  903, 908-09 (9th Cir. 2009) (holding prosecutor had duty to learn of favorable evidence gathered

17  by his investigating officer), there is nothing in the record here to suggest the Navy was part of the

18  prosecution team, let alone that the prosecutor knew or should have known that Vance, who had

19  already testified during the guilt phase of petitioner's trial, was discharged from the Navy at some

20  point thereafter.  Petitioner's contention that the prosecution "had to have known" because Vance

21  testified in her uniform at the guilt phase but not the penalty phase (*see* Pet'r's Br. at 49), is

22  unpersuasive.  Vance's choice of attire in court is not enough to put the prosecution on notice that

23  Vance had been discharged.  Petitioner also argues that it would be irresponsible for the

24  prosecution to allow Vance to testify a second time without inquiring into her background, but

25  cites no authority holding the prosecution must conduct a new inquiry into a witness's background

26  when, as here, such witness is recalled to testify in the same trial.

27         In any event, even assuming the discharge records were suppressed and favorable,

28  petitioner has not made a sufficient showing as to their materiality.  Although Vance testified at

United States District Court
Northern District of California

the guilt phase that petitioner displayed in her presence a black revolver with a brown grip and that the gun she saw looked like the gun the prosecution presented as the murder weapon at trial, Vance was not the only witness who described petitioner as having a gun resembling the one recovered by law enforcement. Purnell, Karen Williams, Shane Williams, and, most notably, surviving victim Haertle provided testimony as to that similarity. Moreover, as discussed above, there was more than ample other evidence connecting petitioner to the charged crimes. Under such circumstances, the California Supreme Court reasonably could have concluded petitioner failed to show the evidence of Vance's military discharge "substantially reduced" the strength of the evidence against petitioner such that confidence in the jury's guilty verdict is undermined. *See Kyles*, 514 U.S. at 441.

As to the penalty phase, Vance testified that, when she was fourteen years old, petitioner showed her a satchel containing rope, wire, and nylon strips that he said he used to gag and tie people, after which he suggested she consider engaging in sexual encounters as a way to make money and offered to set her up with his friends for a portion of the proceeds. To the extent Vance's pre-service drug use may be considered favorable to the defense at the penalty phase, Vance's testimony at that stage constituted only a small piece of the aggravating evidence presented by the prosecution, which evidence included petitioner's long and violent criminal history, several uncharged murders, and testimony from petitioner's ex-wife and several mental health professionals suggesting petitioner was in total control of his actions at the time of the crimes. Under such circumstances, the California Supreme Court, with regard to the penalty phase, reasonably could have concluded petitioner failed to show the Navy discharge materials "put the whole case in such a different light as to undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435.

Accordingly, Claim 9E will be denied.

**D. Claim 9F: Robertson, Josselyn, and Stusek Sightings**

In Claim 9F, petitioner alleges the prosecution violated *Brady* when it failed to disclose the Suspect Information Reports ("SIRs"), and the statements contained therein, for witnesses Olive Robertson ("Robertson"), Renee Josselyn ("Josselyn"), and Geraldine Stusek ("Stusek").

24

Petitioner claims Robertson, Josselyn, and Stusek saw the actual perpetrator of the Hansen/Haertle crimes and that the man they saw was not petitioner. Respondent contends petitioner has failed to adequately allege suppression, favorability, or materiality.

### 1. The Robertson, Josselyn, and Stusek SIRs

Following the Hansen/Haertle crimes, the Santa Cruz Sheriff's Department ("Sheriff's Department") issued a statement, which included a description of the suspect and a request for information. In that statement, the suspect was described as a white male, in his early 50s,[11] 5'10" to 6" tall, 170 pounds with a slender to medium build, and "close-cut thinning blond hair which [was] turning gray," wearing "a blue baseball type cap" and a "yellowish orange windbreaker with the words Olympic Beer Drinking Team printed on the back and a patch with the name Bud on the front." (*See* Robertson Test., App. 6 at 14279-81.) As a result, the Sheriff's Department subsequently collected numerous SIRs detailing information provided to them by members of the public. Petitioner alleges the defense was not provided with the following information.

On April 3, 1981, five days after the Hansen/Haertle crimes, Robertson called the Sheriff's Department and reported she had seen a man at Henry Cowell Park after 4:00 p.m. on March 26, 1981, three days before those crimes. The man she saw was 5'9" and of average build and wore a "yellowish" jacket reading "Olympic Drinking" in brownish letters on the back. (*See* Robertson SIR, App. 5 at 1.) Subsequently, at petitioner's San Diego trial, Robertson testified that the date was March 19, 1981, that she saw the man at the park gift shop, that he weighed approximately 170 pounds to 175 pounds, that he was not wearing glasses, that the jacket he was wearing was bright yellow and had the words "Olympic" or "Olympia Drinking Champion" on the back (*see* Robertson Test., App. 6 at 14250), and that she saw the same man again at a restaurant in the same area on April 19, 1981. Robertson also testified the man she saw on both occasions was not petitioner.

On April 4, 1981, six days after the Hansen/Haertle crimes, Josselyn called the Sheriff's Department to report that she saw a man at a 7-11 store on Highway 9 in Santa Cruz between 1:30

_____

[11] At the time of the Hansen/Haertle crimes, petitioner was 50 years old. *See Carpenter*, 15 Cal. 4th at 422.

25

p.m. and 1:45 p.m. on the date of the crimes. The man was under six feet tall, medium weight, and middle-aged. Josselyn stated he was driving an oxidized blue American car and was wearing glasses. She also stated that the man was wearing a yellow nylon jacket with "Bud" on the front and "Olympic Beer Drinking" in black block letters on the back. (*See* Josselyn SIR, App. 2 at 1.) At petitioner's San Diego trial, Josselyn was called as a witness and testified to substantially the same information, adding that the car she saw was not a station wagon. During her testimony, Josselyn was unable to determine whether the person she saw was petitioner.

On April 20, 1981, several weeks after the Hansen/Haertle crimes, Stusek sent a letter to the Sheriff's Department stating that, at approximately 4:20 p.m. on April 4, 1981, i.e., six days after the Hansen/Haertle crimes, she saw a man matching the Sheriff's Department's description of the suspect walking westbound on Carmel Valley Road at Garland Park.[12] According to Stusek, the man was approximately forty-five to fifty years old and 5'8" or 5'9" in height, weighed approximately 175 pounds, and wore a yellow jacket with the word "Bud" on it. (*See* Stusek SIR & Attached Letter, App. 7 at 3.) Stusek provided a sketch of the man along with a sketch of the "Bud" logo she saw on the jacket. Her SIR was stamped with the words "Look-a-Like." (*See id.* at 1.)

### 2. Analysis

Respondent argues it is unclear where petitioner derived the factual basis for his assertion that he did not receive the three SIRs in question, as trial counsel's declaration states that he did not receive reports for "most of the sightings" (*see* Biggam Decl., App. 111 at 3), but does not specify whether he knew of, or otherwise received, those SIRs. Nevertheless, even assuming the prosecution indeed suppressed the reports, petitioner fails to show they were material.[13]

Petitioner argues the Robertson SIR was material because, at petitioner's San Diego trial,

---

[12] In his briefing, respondent states Garland Park is located in Monterey County.

[13] Petitioner argues the Court, in determining whether he has adequately alleged suppression, need only look to the sufficiency of the claims as pleaded in his petition. Petitioners, however, are responsible for providing the factual basis for their assertions. *See Duvall*, 9 Cal. 4th at 474 (holding allegations with no factual basis do not entitle petitioner to relief or hearing).

Robertson testified that the man wearing the beer-themed jacket, whom she stated she saw at Henry Cowell Park, was not petitioner. Petitioner fails to show materiality. Robertson did not see that individual near the time of the commission of the Hansen/Haertle crimes, or even on the same day as those crimes, but, rather, on two dates having no significance to the prosecution's case. Although the Robertson SIR arguably was favorable to the extent it can be interpreted as showing more than one individual owned a yellow, beer-themed jacket, such an inference would not challenge the crux of the evidence pointing to petitioner, namely, that he was identified by Haertle and Leland Fritz, that he had access to the murder weapon, and that he owned a red Fiat similar to the one seen leaving the scene. Moreover, petitioner overestimates the strength of Robertson's testimony. In particular, Robertson's testimony was seriously undermined during the San Diego trial, at which Robertson admitted she never saw the suspect's full face. Further, in the SIR, Robertson's description of the suspect did not include details, and, at the San Diego trial, she admitted she called the Sheriff's Department after reading about the case in the newspaper, which coverage included, as noted, a description of the suspect and his distinctive jacket. Given all of the above, petitioner fails to show the Robertson SIR was material.

With respect to the Josselyn SIR, the parties, in their respective briefs, speculate about the identity of the individual Josselyn saw. Whether the person Josselyn saw was someone other than petitioner, however, has little relevance, as he was seen hours before the Hansen/Haertle crimes and at a location other than where those crimes were committed. The only observation made by Josselyn arguably suggesting the person she saw was in any manner involved in the Hansen/Haertle crimes was a general description common to many individuals and a yellow, beer-themed jacket. Moreover, even if the individual Josselyn saw was the person who went to Henry Cowell Park hours later and committed the Hansen/Haertle crimes, the fact he was seen by Josselyn driving a blue American car did not exclude petitioner as the perpetrator, as petitioner owned, along with the red Fiat described by Leland Fritz as fleeing the Hansen/Haertle crime scene, a blue Chevrolet, albeit a different model than Josselyn described. Consequently, given the limited value of Josselyn's sighting and all of the evidence, as described earlier herein, connecting petitioner to the Hansen/Haertle crimes, petitioner fails to show the Josselyn SIR was material.

As to the third of the three SIRs, the Stusek SIR, petitioner argues such report was favorable and material because petitioner had a credible alibi that he was working all day in San Francisco on April 4, 1981, the date on which it appeared someone had urinated near the spot where Hansen's body was found, and thus he could not have been the individual Stusek saw walking down Carmel Valley Road. Again, petitioner's argument is unpersuasive.

First, as to the guilt phase of the trial, petitioner fails to show materiality. Other than Stusek's general description of a man with commonly encountered characteristics and wearing a yellow, beer-themed jacket, Stusek's observations had no significance as to the prosecution's case. Whether the person Stusek saw was or was not petitioner, Stusek observed him five days after the Hansen/Haertle crimes and in an entirely different county than that in which those crimes were committed. In sum, as with the other two SIRs, the information in Stusek's SIR does not challenge the crux of the evidence pointing to petitioner as the perpetrator of the charged crimes. Given the very strong evidence connecting petitioner to the Hansen/Haertle crimes, petitioner has failed to show the Stusek SIR was material.

Second, as to the penalty phase, to the extent petitioner contends the Stusek SIR could have been used to challenge the inference the prosecution sought to draw from Robert Tanner's testimony regarding the damp spot he saw at the Hansen/Haertle crime scene on April 4, i.e., an inference that the person who committed the Hansen/Haertle crimes returned within the week and urinated near the place where Hansen's body was found, petitioner likewise fails to show the Stusek SIR was material. The evidence of urination constituted only a miniscule fragment of the aggravating evidence, detailed earlier herein, that was presented by the prosecution.

Lastly, petitioner's citation to *United States v. Jernigan*, 492 F.3d 1050 (9th Cir. 2007), for the proposition that the "sightings" undermine the prosecution's case against him (*see* Pet'r's Br. at 52) is misplaced. In *Jernigan*, a defendant's conviction for bank robbery rested entirely on the "shaky" testimony of five eyewitnesses. *See Jernigan*, 492 F.3d at 1054. While the defendant was in custody for the robberies, a suspect with a physical resemblance to the defendant and similar modus operandi committed two more bank robberies in the area, none of which were disclosed to the defense. Given the inconsistencies and inaccuracies of the eyewitness testimony

28

1    presented at trial, the Ninth Circuit found the prosecution violated *Brady*, noting evidence of

2    "another bank robber['s]" similar appearance, modus operandi, and getaway vehicle would have

3    cast significant doubt on the prosecution's case. *See id.* at 1055.  In so finding, the Ninth Circuit

4    emphasized the absence of physical evidence tying the defendant to the crimes with which he was

5    charged and that any such evidence was to the contrary; in particular, a fingerprint lifted from the

6    teller's window did not match that of the defendant. *See id.*  Here, by contrast, as discussed above,

7    Robertson, Josselyn, and Stusek's sightings of a middle-aged man wearing a beer-themed jacket

8    occurred in circumstances wholly unrelated to any criminal conduct, let alone crimes similar to

9    those with which petitioner was charged, and there was considerable evidence implicating

10   petitioner as the perpetrator of the charged crimes.

11       For all of the above reasons, the California Supreme Court reasonably could have

12   concluded that the SIRs would not have "put the whole case in such a different light as to

13   undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435.

14       Accordingly, Claim 9F will be denied.

15   **E. Claim 9G: Witness Intoxication**

16       In Claim 9G, petitioner contends the prosecution violated *Brady* when it failed to disclose

17   that Sergeant Dennis Smith ("Smith") of the Sheriff's Department was aware Fred Morse

18   (hereinafter, "Morse") was intoxicated on March 29, 1981, the day of the Hansen/Haertle crimes.

19   As previously noted, Morse testified that, on the date of those crimes, he saw a man drinking

20   water at a fountain and then saw the same man on the Ridge Trail after the shootings.  At trial, he

21   identified petitioner as the man he saw.  According to petitioner, information that Morse was

22   intoxicated during his interview could have been used to impeach Morse's identification of

23   petitioner at trial.  In particular, although no intoxication tests were administered, Smith testified at

24   the San Diego trial that Morse had a moderate odor of alcohol and watery eyes, and that, at times,

25   he "had to re-ask" Morse "to clarify what he had said." (*See* Smith Test., App. 9 at 10171.)

26   Respondent does not dispute that the information in question was not disclosed.  Petitioner,

27   however, again fails to show a *Brady* violation.

28       First, Smith's observations were not necessarily impeaching because there is no evidence

that Morse was intoxicated at the time he saw petitioner at the scene of the crimes, which, as

described above, was around 5:00 p.m. Rather, Smith observed that Morse might have been

"slightly" or "moderately" intoxicated at the time he was interviewed (*see* Smith Test., App. 9 at

10169), which was several hours later, at "approximately 8:00, 8:30 p.m." (*see id.* at 10164).[14]

Moreover, Smith noted that Morse's description of the man he saw on the trail was "consistent

with those of other independent witnesses." (*See id.* at 10170.) In any event, to the extent any

showing of intoxication could have been used to impeach Morse's identification of petitioner,

such evidence would have been cumulative, as the jury already had before it stronger defense

evidence bearing on Morse's in-court identification of petitioner: specifically, Morse's inability to

identify petitioner at either a lineup or the preliminary hearing. *See, e.g.*, *Rodriguez*, 766 F.3d at

989 (holding nondisclosure of impeaching evidence not material where witness's credibility

already undermined). Lastly, as noted above, Morse was not the only person to place petitioner at

the scene of the crime. Petitioner was positively identified by two other witnesses, Haertle and

Leland Fritz, the latter of which also identified petitioner's red Fiat.

Under such circumstances, the California Supreme Court reasonably could have concluded

petitioner failed to show the evidence of Morse's intoxication would have "put the whole case in

such a different light as to undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435.

Accordingly, Claim 9G will be denied.

**F. Claim 9H: April 4 Shoeprints**

**1. Shoeprint Evidence**

Following the March 29, 1981, shootings of Hansen and Haertle at Henry Cowell Park, the

Sheriff's Department sealed the area around the observation deck and spotted several shoeprints,

including three near the water fountain, "at least one" within five to six feet of Hansen's head (*see*

76 RT 11286), one approximately fifty-seven feet down the trail, and another approximately

fourteen feet from Hansen's body ("March 29 shoeprints"). Tanner made casts of several of the

---

[14] Although not part of the Court's analysis, the Court notes it would not be surprising that an individual anticipating a peaceful outing in a park might, after witnessing the aftermath of a bloody shooting and homicide, decide to have a drink or two.

shoeprints and photographed them. Two of the three shoeprints found by the water fountain had the same "class characteristics" as a pair of Nike tennis shoes purchased by petitioner on March 28, 1981, the day before the shootings. (*See* 75 RT 11285.) The remaining prints all shared similar characteristics with the shoeprints observed near the water fountain.

On April 4, 1981, Tanner returned to the Henry Cowell Park crime scene after being notified that more shoeprints were discovered by Sheriff's Department personnel ("April 4 shoeprints"). Tanner saw and photographed the new shoeprints, which led from the observation deck down past the area where Hansen's body was found. As noted above, Tanner testified during the penalty phase that he saw a damp spot of earth directly above the area where Hansen's head had been observed, which he believed was urine. Tanner also testified that the April 4 shoeprints were "identical in class characteristics" and "approximately the same size in length and width" as the March 29 shoeprints. (*See* 111 RT 16308.)

### 2. Analysis

In Claim 9H, petitioner contends the prosecution committed a *Brady/Napue* violation at the penalty phase by allowing Tanner to testify falsely that the April 4 shoeprints matched the March 29 shoeprints. *See Napue v. Illinois*, 360 U.S. 264 (1959). Petitioner does not allege the prosecution had any exculpatory reports related to the April 4 shoeprints or that the photographs of the shoeprints were not turned over to the defense; rather, he alleges Tanner's testimony regarding the April 4 shoeprints amounted to the knowing presentation of false evidence in violation of *Napue*.

A *Napue* violation is a type of *Brady* violation. Under *Napue*, a state "may not knowingly use false evidence, including false testimony," against a defendant in order to obtain a conviction or sentence. *See Napue*, 360 U.S. at 269. "A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of a jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted). To demonstrate a *Napue* violation, petitioner must show that the evidence in question was false, that the prosecution "knew or should have known" it was false, and that the false evidence was material. *See Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005)

(en banc) (citation omitted).  As set forth below, petitioner fails to show a *Brady/Napue* violation.

First, petitioner fails to show Tanner's testimony was in fact false.  Petitioner's evidence on that point consists of: (1) a report and corresponding testimony from his San Diego trial, in which a defense expert opined that the March 29 shoeprints have 28 ridges; and (2) an excerpt from the prosecutor's closing argument in the San Diego trial, in which the prosecutor stated he looked at a photograph of the April 4 shoeprints and counted 31 ridges.  A prosecutor's closing remarks, however, do not constitute evidence, and, more importantly, nothing in the prosecutor's closing remarks suggests he disagreed in any manner with the comparison made by Tanner.  Indeed, petitioner does not dispute that the March 29 and April 4 shoeprints had similar characteristics, including the same chevron pattern, nor does he cite to anything else in an effort to explain his assertion that the Tanner testimony regarding the April 4 shoeprints was incorrect, let alone knowingly false.  *See, e.g., Harris v. Vazquez*, 949 F.2d 1497, 1524 (9th Cir. 1990) (holding petitioner's current expert's opinion that prior expert made incorrect diagnosis at trial did not establish prior expert's testimony was false); *see also Browning v. Baker*, 875 F.3d 444, 460 (9th Cir. 2017) (holding "it is not clearly established that a police officer's knowledge of false testimony may be attributed to the prosecution under *Napue*") (internal quotation and citation omitted).

Under such circumstances, the California Supreme Court reasonably could have concluded petitioner failed to establish a *Brady/Napue* violation.  *See Richter*, 562 U.S. at 101.

Accordingly, Claim 9H will be denied.

**G.  Claim 9I:  Long-Distance Telephone Records**

In Claim 9I, petitioner alleges the prosecution violated *Brady* when it misled the defense by: (1) providing telephone records, purportedly showing calls made from petitioner's residence on the date of Scaggs' disappearance, but which in fact were not petitioner's records; and (2) failing to turn over a copy of petitioner's actual telephone records until "months later."  (*See* FAP at 71-72.)  As respondent points out, however, the fairest reading of petitioner's claim makes clear that the defense had the records in question for more than two years before trial.  In particular, petitioner, in his first state petition, acknowledged defense counsel received the correct billing

records within "months" after June 16, 1981 (*see* Pet. for Writ of Habeas Corpus, S058191 (Dec. 24, 1996) at 22), and petitioner's trial did not begin until May 24, 1984.

Moreover, even assuming the telephone records were suppressed, petitioner fails to show the records were material. Petitioner contends the records were material because they show a phone call was made from the Carpenter residence on the morning of Scaggs' disappearance, which would have led counsel to investigate whether petitioner was at home on that day. If petitioner were in fact at home that morning, his own knowledge thereof would have been available to him before trial irrespective of the records.[15] *See United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (holding defendant "cannot claim a *Brady* violation if he was aware of the essential facts enabling him to take advantage of any exculpatory evidence") (internal quotation and citation omitted). Further, as discussed above, there was considerable evidence connecting petitioner to Scaggs' disappearance and murder, including evidence that he planned to meet Scaggs that morning, his incriminating statement to the police prior to the discovery of Scaggs' body, and the ballistics evidence identifying petitioner's gun as the gun used to kill Scaggs. Under such circumstances, the California Supreme Court reasonably could have concluded petitioner failed to show the telephone records "put the whole case in such a different light as to undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435.

Accordingly, Claim 9I will be denied.

**H. Claim 9J: Davis, Melnyk, and Drapkin Narratives**

In Claim 9J, petitioner contends the prosecution violated *Brady* when it failed to disclose police reports and investigative narratives from James Davis ("Davis"), Sharon Melnyk ("Melnyk"), and Larry Drapkin ("Drapkin"). Petitioner argues the reports show the uncharged murders of Moreland and Stowers[16] were committed no later than 2:00 p.m. on October 11, 1980, a time frame for which petitioner had an alibi. Respondent argues petitioner has failed to establish

---

[15] Indeed, when questioned by the police, petitioner claimed he did not meet Scaggs that morning because he'd overslept and was at home at the time they had planned to meet. *See Carpenter*, 15 Cal. 4th at 347.

[16] The prosecution presented evidence of the uncharged murders during both the guilt and penalty phases of the trial.

suppression and materiality.

### 1. The Narratives

In a December 5, 1980, statement, Davis told police he was a friend of Moreland and Stowers. Davis stated he saw Moreland and Stowers on October 11, 1980, in front of a Point Reyes bookstore at approximately 12:30 p.m. and that the three spoke for about fifteen minutes, after which Moreland and Stowers agreed to stop by Davis's home later that day. Davis further told police that Moreland and Stowers never stopped by as planned and that he never saw them again. At petitioner's San Diego trial, Davis testified he saw Moreland and Stowers in front of the bookstore "around noon" and that he saw Moreland and Stowers a second time on October 11, 1980, inside a Point Reyes grocery store "about a half hour later." (*See* Davis Test., App. 48 at 13487, 13489.)

Melnyk and Drapkin did not know Moreland and Stowers. Melnyk and Drapkin were hiking in Point Reyes on October 11, 1980, when they thought they heard a series of shots. In two narrative reports, one of the deputy sheriffs noted that Melnyk heard the shots between noon and 1:00 p.m. In three other reports, other deputy sheriffs noted that Melnyk and Drapkin reported hearing shots at approximately 11:00 a.m. At petitioner's San Diego trial, Melnyk testified she arrived at Point Reyes at approximately 12:30 p.m. and that approximately 45 minutes later, while she was on the Point Reyes Sky Trail, she heard three noises that sounded like shots.

### 2. Petitioner's Alibi

Petitioner alleges he was shopping with his mother in San Francisco on October 11, 1980. In support thereof, petitioner cites to a Visa receipt for $28.06 signed by his mother. Petitioner also cites to the San Diego trial testimony of Sylvia Rosenburg ("Rosenburg"), a San Francisco store owner, confirming items totaling $28.06 were purchased at her store on October 11, 1980, and "guess[ing]" that the purchase may have been made between 1:30 p.m. and 2:30 p.m. (*See* Rosenburg Test., App. 131 at 16347.) Petitioner points to no evidence showing he was present at the time of the purchase.

### 3. Analysis

Petitioner has not shown a *Brady* violation. Even assuming at least potential favorability,

petitioner has not made a showing that the narratives were material.[17]  Petitioner asserts the narratives were material because he had an alibi for the afternoon of October 11, 1980, and the narratives would have allowed the defense to substantially damage the prosecution's case, which he argues was built on the theory that the same gun used to kill Stowers was also used to kill Hansen and Scaggs.  Petitioner also argues that, given the narratives, the state court's denial of his claim would have constituted an unreasonable determination of the facts.

Petitioner's argument is unpersuasive.  The exculpatory nature of the narratives is directly tied to petitioner's alleged alibi, and petitioner failed in state court—and again fails here—to cite to anything other than his own "self-serving" and unsworn allegation to show he was shopping in San Francisco with his mother that afternoon.  In California, a state habeas petitioner has the burden of showing he is entitled to relief by, *inter alia*, submitting "reasonably available . . . trial transcripts and affidavits or declarations."  *See Duvall*, 9 Cal. 4th at 474.  Here, petitioner submitted only his unsupported allegation that he was shopping with his mother; he pointed to no evidence substantiating his assertion that he was present during the purchase at Rosenburg's store. *See, e.g., Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000) (rejecting claim that alibi witness existed when petitioner's only support was his own "self-serving affidavit").

Moreover, even if petitioner had provided such support, he nonetheless fails to show the Davis, Melnyk, and Drapkin narratives would have "put the whole case in such a different light as to undermine confidence in the verdict."  *See Kyles*, 514 U.S. at 435.  As noted above, Rosenburg's testimony as to the time frame for the $28.06 purchase was equivocal, and, absent any allegation, let alone other evidence, as to the time petitioner was at the shop, petitioner has not shown the narratives would have carried much exculpatory weight as to the Moreland/Stowers crimes, let alone the charged crimes.  See *Olsen*, 704 F.3d at 1184 (holding "mere possibility" that undisclosed information "might have helped the defense or might have affected the outcome of the trial" does not establish materiality under *Brady*).[18]

---

[17] For purposes of the instant analysis, the Court also assumes the reports were not adequately disclosed to the defense.

[18] The Court also notes the parties did not include any evidence or allegations regarding the

In sum, the favorability and materiality of the Davis, Melnyk, and Drapkin narratives rested on petitioner's alibi, and, given the above-described deficiencies in petitioner's pleadings related to his alibi, as well as the significant evidence of guilt as to the charged crimes, the California Supreme Court reasonably could have concluded petitioner did not show "a reasonable probability [existed] that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Cone*, 556 U.S. at 469-70; *see also Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (upholding denial of *Brady* claim where claim "argued in a single page [w]ithout reference to the record or any document") (internal quotation omitted).

Accordingly, Claim 9J will be denied.

**I.  Claim 9L:  Criminalist's Notes**

In Claim 9L, petitioner asserts the prosecution violated *Brady* when it failed to disclose bench notes made by criminalist Richard Waller ("Waller").  Petitioner contends the notes would have allowed his counsel to establish Waller's methodology was unreliable and that Waller's conclusion as to the serological evidence taken from the Alderson crime scene, i.e., that the blood type of the semen on Alderson's panties matched petitioner's blood type, and is found in only a small percentage of the population, thus was unreliable as well.  Respondent does not contend the bench notes were provided before the San Diego trial; rather, respondent contends petitioner fails to allege suppression because the prosecution timely provided Waller's report and that, in any event, petitioner has not shown the bench notes were material.

The record supports respondent's assertion that the prosecution turned over the report and other data from Waller and turned over Alderson's panties for testing.  Petitioner has not identified any discrepancies between the report and the notes or explained how any information contained only in the notes would have enabled counsel to impeach Waller's testimony.  Petitioner points only to the testimony of Dr. Benjamin Grunbaum ("Grunbaum"), who testified on behalf of the

---

time required to travel the distance between the Moreland/Stowers crime scene and Rosenburg's store.  The narratives, however, show a varying window between the time Melnyk and Drapkin heard what appeared to be shots, which, according to various accounts may have occurred anywhere from 11:00 a.m. to 1:15 p.m., and the time of the purchase in San Francisco, which, based on Rosenburg's testimony, may have occurred between 1:30 p.m. and 2:30 p.m.

1    defense at petitioner's San Diego trial, during which testimony Grunbaum noted some of the

2    factors that may affect the reliability of results from a stain analysis, including, *inter alia*, the

3    condition of the crime scene, the amount of time a body is exposed to the elements, the number of

4    times the sample is tested, the type of test used, and whether or not the analyst photographs the

5    results of certain tests. In Grunbaum's opinion, Waller's use of an insufficiently established test,

6    along with a failure to photograph the results of another test, rendered Waller's conclusion

7    regarding the blood type found on Alderson's panties unreliable. Petitioner fails to explain,

8    however, how Grunbaum's testimony was in any manner predicated on the contents of Waller's

9    bench notes rather than on information contained in Waller's final report and Grunbaum's general

10   knowledge of practices pertaining to stain analysis.

11        Moreover, even if petitioner had shown the bench notes were in some manner relevant to

12   the jury's evaluation of Waller's testimony, Waller's conclusion as to the matching blood types

13   was not the only evidence tying petitioner to the uncharged Alderson crimes. The prosecution

14   presented undisputed ballistics evidence implicating petitioner's gun in the Alderson crimes, and,

15   even if the jury were to completely disregard Waller's conclusions as to blood type, such

16   circumstance would do little to challenge the bulk of the previously discussed evidence upon

17   which petitioner's convictions rest.

18        In sum, given the deficiencies in petitioner's pleadings, as well as the significant evidence

19   tying petitioner to the charged crimes, the California Supreme Court reasonably could have

20   concluded petitioner failed to show the bench notes "put the whole case in such a different light as

21   to undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435.

22        Accordingly, Claim 9L will be denied.

23        **J.  Claim 9M:  Surveillance Photos**

24        In Claim 9M, petitioner contends the prosecution violated *Brady* when it failed to disclose

25   multiple surveillance photos of petitioner and the Williamses during their trip to the Gems of the

26   Golden West warehouse in San Francisco on May 13, 1981. Respondent disputes petitioner's

27   assertion that the photos were suppressed or that any of the photos were favorable or material.

28        Petitioner again fails to establish a *Brady* violation. First, it is unclear from the record

37

provided whether the prosecution withheld any surveillance photographs from defense counsel. (*See* Biggam Decl., App. 111 at 2 (stating federal government was "not forthcoming," but without specifying whether or not the surveillance photos were disclosed).) Petitioner cites only an excerpt from a book, *The Sleeping Lady*, in which the author, Robert Graysmith, states "nine surveillance photos were silently taken by the police" as petitioner and the Williamses entered the warehouse. (*See* Excerpt from *The Sleeping Lady*, App. 11 at 2.) Moreover, even assuming any surveillance photographs were suppressed by the prosecution, petitioner fails to show those photographs were favorable or material. Petitioner's assertion that the photographs were "significant evidence" (*see* Pet'r's Br. at 79) rests solely on speculation that the photographs may have shown that neither of the Williamses, who testified petitioner gave them the .38-caliber Rossi in a bag, was in fact carrying a bag at the time they exited the warehouse. Petitioner must provide more than supposition in order to show *Brady* materiality. *See Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) (holding "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense") (internal quotation and citation omitted). Given the deficiencies described above, the California Supreme Court reasonably could have concluded petitioner failed to show a *Brady* violation. *See Richter*, 562 U.S. at 101.

Accordingly, Claim 9M will be denied.

**V.  Evidentiary Error:  Claim 24, Admission of Videotape**

In Claim 24, petitioner contends the admission of a videotape during the guilt phase of his trial violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[19] Petitioner's challenge to the admission of the videotape was rejected by the California Supreme Court in a reasoned opinion on direct appeal.

As set forth therein, the trial court, over a defense objection, admitted a silent, fifteen-minute videotape depicting thirteen aspects of the Hansen/Haertle crime scene, which videotape was admitted to "illustrate" Haertle's testimony. *See Carpenter*, 15 Cal. 4th at 386. Prior to

---

[19] Although petitioner cites to the above-listed four Amendments, his argument is essentially made on due process grounds.

ruling on its admissibility, the trial court viewed the videotape and described it as containing "'absolutely nothing sensational or apt to raise passions at all. . . .'" *See id*. Haertle, who narrated the tape as it was shown in court, testified he directed the taping and confirmed that it accurately depicted the crime scene as it appeared on the day of the shooting.

On direct appeal, the California Supreme Court considered petitioner's assertion of error and, in denying the claim, provided the following explanation:

> Defendant contends the court erred. "In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them. [Citation omitted.] Within these limits, the physical conditions which existed at the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time the [videotape] is taken." (*People v. Rodrigues,* [8 Cal. 4th 1060, 1114 (1994) (internal quotation and citation omitted)]. Defendant claims the tape lacked sufficient foundation. Haertle's testimony that it accurately depicted the crime scene, however, provided the foundation. Defendant also complains it was "seriously misleading," primarily because some of the scenes lasted longer than the actual events and the camera, which was generally stationary, did not move along the trail as Haertle had.
>
> Differences between real life and a videotape are inevitable and readily apparent to the jury. The videotape illustrated Haertle's testimony; it did not replace it. Defendant cites *People v. Sims* (1993)[,] 5 Cal. 4th 405, 452 [parallel citations omitted], where we upheld the admission of a videotape but cautioned "that in other circumstances, a videotape may present a far more graphic, gruesome, and potentially prejudicial depiction than static photographs and this, under such circumstances, should be excluded from evidence." However, defendant does not claim the videotape was graphic or gruesome. The court acted within its discretion in admitting it. (*Ibid.*)
>
> Defendant also contends the prosecution violated the court's discovery order because it did not give the videotape to the defense until "many months after the final discovery deadline." The tape was not filmed, however, until long after that deadline. The prosecution need not provide discovery of evidence before it exists. It provided the tape to the defense a reasonable time after it was filmed. Moreover, defendant did not request a continuance of trial. "It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm." (*People v. Pinholster*, [1 Cal. 4th 865, 941 (1992)].) He does not meet this burden. In addition, contrary to defendant's contention, there is no requirement the prosecution prepare written reports about the videotaping sessions. (*See People v. Fauber*, [2 Cal. 4th 792, 828-30 (1992)]).

*Carpenter*, 15 Cal. 4th at 385-87.

1   Now, in support of the instant claim, petitioner contends the California Supreme Court's

2   failure to cite any federal law renders § 2254(d) inapplicable and, as a result, this Court must

3   review his claim de novo. Respondent argues de novo review is barred under § 2254(d). *See*

4   *Pinholster*, 563 U.S. at 181 (describing standard for "evaluating state-court rulings" under

5   § 2254(d) as "highly deferential") (internal quotation and citation omitted). The Court need not

6   resolve this dispute, however, because petitioner's claim would fail under either standard of

7   review.

8       First, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial

9   fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by

10  'clearly established Federal law,' as laid out by the Supreme Court," *see Holley v. Yarborough*,

11  568 F.3d 1091, 1101 (9th Cir. 2009) (quoting § 2254(d)), and the Supreme Court "has not yet

12  made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

13  process violation sufficient to warrant issuance of the writ," *see id.* at 1101 & n.2 (finding trial

14  court's admission of irrelevant pornographic materials "fundamentally unfair" under Ninth Circuit

15  precedent, but not contrary to, or unreasonable application of, clearly established federal law under

16  § 2254(d)). Moreover, the California Supreme Court found the videotape was neither graphic nor

17  gruesome, and it accurately illustrated Haertle's testimony. *See Carpenter*, 15 Cal. 4th at 386.

18      Second, even if the videotape's admission were reviewable de novo, petitioner fails to

19  show it was improperly admitted. Even before the adoption of AEDPA, the Ninth Circuit had

20  held a "failure to comply with the state's rules of evidence" is "no[t] a sufficient basis for granting

21  [federal] habeas relief" on due process grounds, *see Jammal v. Van de Kamp*, 926 F.2d 918, 919

22  (9th Cir. 1991) (noting "it is certainly possible to have a fair trial even when state standards are

23  violated"). Rather, the question is whether such error "rendered the trial so arbitrary and

24  fundamentally unfair that it violated federal due process." *See id.* (internal quotation and citation

25  omitted). Here, petitioner does not contend the videotape can be characterized in any manner as

26  inflammatory. To the extent he argues the videotape does not reflect the events precisely as

27  described by Haertle, defense counsel had ample opportunity to cross-examine Haertle about the

28  length of the incident, the accuracy of the images, and the circumstances surrounding the creation

of the video.  In sum, there were permissible inferences for the jury to draw from the videotape and the danger of prejudice was minimal; petitioner thus has not demonstrated its admission violated due process.  *See id.* at 920.

Accordingly, Claim 24 will be denied.

## VI.  Factual Determination Under § 2254(d)(2) and Evidentiary Hearing

As noted, the California Supreme Court did not hold an evidentiary hearing and denied petitioner's claims in a summary order.  Throughout his briefing, petitioner asserts that, to the extent said court made factual determinations or resolved factual disputes without a hearing, its decision involved an unreasonable determination of facts within the meaning of § 2254(d)(2).

Petitioner's argument is unavailing.  As noted, with the exception of Claim 24, the California Supreme Court made no express factual findings in denying petitioner's habeas claims on the merits.  Although factual findings were implicit in the state court's denial, petitioner cannot predicate his argument on a general grievance that such court resolved factual disputes without a hearing.  Rather, petitioner must establish that the factual determinations made by the state court were unreasonable "in light of the record before the state court."  *See Richter*, 562 U.S. at 100.  As noted above, petitioner has not shown the California Supreme Court unreasonably determined any facts.  Moreover, insofar as petitioner argues he is entitled to an evidentiary hearing on any of the above-discussed claims, his request is foreclosed in light of this Court's determination that his claims are governed by § 2254(d) and unmeritorious.  *See Pinholster*, 563 U.S. at 180.

## CONCLUSION

For the foregoing reasons, Claims 9B, 9D.1, 9E, 9F, 9G, 9H, 9I, 9J, 9L, 9M, and 24 in petitioner's First Amended Petition are hereby DENIED.  Within 30 days of the date of this Order, the parties shall file a proposed briefing schedule for his Group 5 claims, specifically Claims 45, 53, 53A, 53B, 53C, 53D, 53E, 53F, 53G, and 53H.

**IT IS SO ORDERED.**

DATED:  April 27, 2018

MAXINE M. CHESNEY
UNITED STATES DISTRICT JUDGE