UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID J. CARPENTER,<br><br>    Petitioner,<br><br>  v.<br><br>RON BROOMFIELD, Acting Warden, San Quentin State Prison,<br><br>    Respondent. | Case No. 98-cv-02444-MMC<br><br>**<u>DEATH PENALTY CASE</u>**<br><br>**ORDER DENYING REMAINING GROUP FIVE CLAIMS** |

**INTRODUCTION**

The instant case arises from Petitioner David Carpenter's convictions and death sentence for the first degree murder and attempted rape of Ellen Hansen, the attempted murder of Steven Haertle, and the first degree murder and rape of Heather Scaggs. *See People v. Carpenter*, 15 Cal. 4th 312 (1997). Although the crimes were committed in Santa Cruz County in 1981, Petitioner was tried in Los Angeles County in 1984, following a change of venue due to pretrial publicity. On April 28, 1997, the California Supreme Court affirmed his convictions and death sentence. *Id.*[1] On January 28, 1998, the United States Supreme Court denied a petition for certiorari. *Carpenter v. California*, 522 U.S. 1078 (1998).

On December 24, 1996, prior to affirmance of his conviction and sentence on direct review, Petitioner filed a state habeas petition in the California Supreme Court, which was denied on May 27, 1998. *In re Carpenter*, No. S058191. While his state habeas petition was pending, Petitioner initiated the instant proceedings by filing, in the United States District Court for the Central District of California, a request for appointment of federal habeas counsel. Following a

---

[1] After his Los Angeles County trial, Petitioner was separately convicted and sentenced to death for, *inter alia*, multiple murders committed in Marin County at around the same time as the Santa Cruz County murders. *See People v. Carpenter*, 21 Cal. 4th 1016 (1999). The Marin County charges were tried in San Diego County. Petitioner's Marin County convictions and death sentence are the subject of a separate federal habeas petition pending before this Court. *See Carpenter v. Chappell*, No. 00-cv-03706-MMC.

transfer of the case to the Northern District and subsequent motion practice relating to the

appointment of counsel, the district court granted Petitioner's motion to equitably toll, for a period

of five months, the statute of limitations set forth in 28 U.S.C. § 2244(d), making his federal

petition due by October 27, 1999.  *See* Docket No. 76 at 38.  On October 22, 1999, Petitioner filed

his initial federal Petition for a Writ of Habeas Corpus, along with a Notice of Additional Claims

and a Motion to Hold Proceedings in Abeyance pending Petitioner's litigation of a second state

habeas petition, which he filed in the California Supreme Court that same day.  Although the

district court set a schedule for the briefing of Petitioner's motion to hold the federal proceedings

in abeyance, the California Supreme Court promptly denied the second habeas petition on

December 1, 1999, *see In re Carpenter*, No. S083035, before briefing was completed.

Petitioner thereafter filed the operative petition, his First Amended Petition (Docket No.

90) (hereinafter "FAP") and withdrew his motion to hold proceedings in abeyance.  Following a

series of orders addressing Respondent's assertions of procedural grounds for dismissal of

portions of the FAP, the litigation of proceedings relating to Petitioner's competency, and the

appeal thereof, the parties agreed to a schedule for the grouping and litigation of Petitioner's

remaining claims.  In previous orders, this Court[2] has denied claims comprising the first four claim

groupings.  This order addresses the Group Five claims that remain, specifically, those portions of

Claim 53 of the FAP that were not previously dismissed as procedurally barred.[3]  For the

following reasons, these claims will be **DENIED**.

---

[2] The case was reassigned to the undersigned on February 15, 2008.

[3] Group Five consists of Claims 45 and 53, both alleging acts of juror misconduct occurring during
Petitioner's Los Angeles County trial.  Claim 45 alleges the penalty phase jurors improperly
speculated Petitioner might be released from prison if he were sentenced to life without parole,
while Claim 53 presents several subclaims alleging discrete acts of juror misconduct causing
jurors' "deliberations and verdicts to be influenced by impermissible and extraneous information."
FAP ¶¶ 927, 1074-1115.  In its order of September 19, 2014, the Court found Claim 45 is
procedurally barred in its entirety because it was first presented in Petitioner's second state habeas
petition and was adjudicated untimely by the California Supreme Court.  Docket No. 244 at 6.
The Court likewise determined portions of Claim 53 that were presented for the first time in
Petitioner's second state habeas petition are also procedurally barred.  *Id.*  Accordingly, this order
addresses only the remaining portions of Claim 53, as further discussed herein.

United States District Court
Northern District of California

### FACTUAL BACKGROUND[4]

Petitioner was charged with the first degree murder and attempted rape of Ellen Hansen ("Hansen") and attempted first degree murder of Steven Haertle ("Haertle").  On March 29, 1981, Hansen and Haertle were college students visiting Henry Cowell Redwoods State Park in Santa Cruz County, where Petitioner confronted them on a hiking trail in the park and committed the acts underlying those charges.  Petitioner was also charged with the first degree murder and rape of Heather Scaggs ("Scaggs").  Petitioner and Scaggs were co-workers.  On May 2, 1981, Petitioner arranged to give Scaggs a ride from her home in San Jose to Santa Cruz, for the purpose of Scaggs's purchasing a vehicle from a friend of Petitioner.  After Scaggs left her home that morning, she was never again seen alive.  On May 24, 1981, hikers found her nude, decomposing body in Big Basin Redwoods State Park, which, like Henry Cowell, is located in Santa Cruz County.  The State alleged several special circumstances related to the charged murders, including multiple murder, rape-murder as to both Hansen and Scaggs, and lying-in-wait as to Hansen.

Prior to his trial on the Santa Cruz charges, Petitioner made a motion to impanel separate guilt and penalty phase juries.  *See* CT 3454-81.  The trial court granted the motion, CT 3514, but further ordered that the guilt and penalty phase juries would hear the guilt phase evidence together so that, in the event of a conviction by the guilt phase jury, the penalty phase jurors would be able to consider the evidence they heard during the guilt phase.  CT 3630.  The penalty phase jurors were selected first, with voir dire commencing on October 11, 1983, and concluding on February 16, 1984.  CT 3656, 3895.  Twelve penalty phase jurors and four alternates were selected.  CT 3895.  Selection of guilt phase jurors was completed on April 5, 1984, with twelve jurors and six alternates selected.  CT 4039.  Trial began on May 23, 1984.  CT 4162.  The guilt phase concluded on July 3, 1984.  CT 4211.  The penalty phase jurors were excused for the duration of guilt phase deliberations, which began that same day.  CT 4211.  On July 6, 1984, the guilt phase jury

---

[4] The Court has extensively detailed the facts and evidence underlying Petitioner's conviction and sentence in prior orders, including, most recently, in its order of April 27, 2018, in which Petitioner's remaining Group Four claims were denied.  *See* Docket No. 251 at 3-10.  The Court limits this section to only those facts necessary to properly frame and put in context the remaining juror misconduct allegations presented in Claim 53.

1  returned its verdicts, finding Petitioner guilty on all counts and finding true the charged special

2  circumstances in the killings of Hansen and Scaggs, thereby moving the trial forward to the

3  penalty stage.  CT 4316-24. The penalty phase commenced on August 15, 1984, and the penalty

4  phase jurors began their deliberations on September 27, 1984. CT 4360, 4395.  On October 5,

5  1984, the penalty phase jury returned verdicts of death for the murders of Hansen and Scaggs

6          On direct appeal, the California Supreme Court observed that, during the guilt phase,

7  "[t]he defense did not dispute that [Petitioner] was the gunman, but sought to cast doubt on

8  whether [Petitioner] lay in wait for Hansen and raped Scaggs."  *See* 15 Cal. 4th at 349 (footnote

9  omitted); *see also id.* at 380 (noting "[t]he evidence that defendant was the Santa Cruz County

10  gunman was so overwhelming that the defense conceded it to the jury").  Indeed, not only was

11  there no such dispute, defense counsel, early in his guilt phase closing argument, informed the

12  jury: "The credible and the convincing evidence that you have heard over the last six weeks

13  clearly shows that David Carpenter killed Ellen Hansen and Heather Scaggs.  That will not be an

14  issue in your deliberations."  RT 14105  Beyond this concession, defense counsel also admitted

15  that, with respect to Hansen, Petitioner "did have a gun in the park, no question about it, and it

16  does show some form of premeditation to commit assaultive conduct, including killing."  RT

17  14115.  He further conceded that Petitioner had formed an "intent to rape" Hansen prior to killing

18  her.  RT 14121-22.  Given these significant concessions, it appears the defense strategy was,

19  essentially, to attempt to persuade the jury that available inferences from stray items of evidence,

20  e.g., that Petitioner wore distinctive clothing, spoke with others in the area of the Hansen killing,

21  and did not appear to have a calculated escape route after the Hansen killing, and that the seminal

22  fluids and sperm recovered from Scaggs's body could have been from her boyfriend, justified a

23  finding that Petitioner abandoned any deliberate, premeditated plan to commit murder and was

24  guilty of only second degree murder or, at a minimum, that the charged special circumstances

25  required to proceed to the penalty phase were not supported.  *See, e.g.,* RT 14109 ("Now, in

26  determining in this case whether the degree [of murder] is first degree or second degree, you have

27

28

1   got to look at all the circumstances surrounding each crime and look at the discretion of the

2   accused.").

3          Although Petitioner's trial counsel made no similar concessions regarding the strength of

4   the aggravating evidence at the penalty phase, such evidence was, by any objective measure,

5   overwhelming.   As summarized by the California Supreme Court, the prosecution's penalty phase

6   evidence depicted a multidecade spree of burglary, robbery, rape, and, eventually, at least seven

7   murders:

8          The prosecution presented evidence of defendant's other crimes and
    convictions.  In 1960, he assaulted a woman in the Presidio of San Francisco with a

9   knife and hammer, then shot at a police officer with a tear gas gun.

10         In January and February 1970, defendant went on a crime spree.  On
    January 27, he assaulted a woman at knifepoint on an isolated road in Santa Cruz

11  County, attempted to rape her, and stabbed her three times.  The next day, he broke
    into a private home in the Santa Cruz Mountains and, using a shotgun in the house,

12  abducted the woman who lived there.  He tied her hands behind her back, drove her
    to another spot, and raped her. The morning after that, January 29, he confronted a

13  woman at gunpoint in the carport under her apartment building in Daly City, tied
    her hands, and stole her car.  On February 3, he robbed a woman in Calaveras

14  County at gunpoint, tied her up, and stole her car.  Later the same day, he abducted
    another woman and her infant son at gunpoint from their home in Angels Camp.

15  Holding the gun on the infant, he forced the woman to drive her car to a remote
    spot, where he raped her.  Defendant was also convicted of escaping from the

16  Calaveras County jail.

17         In addition to the murders of Anne Alderson, Cynthia Moreland, and
    Richard Stowers, the prosecution proved that in November 1980, defendant fatally

18  shot Shauna May and Diane O'Connell in the head near where he shot Moreland
    and Stowers. May's vagina contained sperm.

19  *Carpenter*, 15 Cal. 4th at 349-50.  Although, as the California Supreme Court observed, Petitioner

20  "presented considerable evidence in mitigation," *id.* at 35, the exceptionally powerful quality and

21  quantity of the aggravating evidence described above, and its potential effect on the jury, is

22  evident.

23  **LEGAL STANDARD**

24         The parties agree that this Court's review of Petitioner's claims is governed by the Anti-

25  terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as codified at 28 U.S.C. §

26  2254(d).  Resp.'s Br. (Docket No. 254) at 1; Pet'r's Br. (Docket No. 256) at 2.  Under AEDPA, a

27  district court may not grant a petition challenging a state conviction or sentence on the basis of a

28

claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1) & (2).  The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Review under § 2254 is limited to the record that was before the state court that adjudicated the claim on the merits.  *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011); *see also* § 2254(d)(2).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and distinct meanings.  *See Williams*, 529 U.S. at 404.  A state court decision is "contrary to" Supreme Court authority and thus falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied.  *See Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

On habeas review, a district court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *See Williams*, 529 U.S. at 411.  Rather, to support granting the writ, the application must be "objectively unreasonable".  *See id.* at 409; *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011) (holding "an *unreasonable* application of

6

federal law is different from an *incorrect* application of federal law") (emphasis in original) (internal quotation and citation omitted).  Accordingly, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004)).  "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts" than previously accorded. *Clark*, 331 F.3d at 1068.

Similarly, on habeas review, a state court's factual determinations are accorded deference. *See Pinholster*, 563 U.S. at 180-81.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340 (citing § 2254(d)(2) & (e)(1)).

Under AEDPA, a federal court applying § 2254(d) reviews the "'last reasoned decision' from the state court, which means that when the final state court decision contains no reasoning, [the federal court] may look to the last decision from the state court that provides a reasoned explanation on the issue." *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018).  Where there is no reasoned state court decision providing a rationale for the state court's conclusions, the "habeas petitioner's burden still must be met my showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.  The habeas petitioner meets this burden only by showing that "fairminded jurists" would not agree with any arguments or theories that may have supported the state court's decision. *Murray*, 882 F.3d at 801-802 (citing *Harrington*, 562 U.S. at 101-102.  In conducting this review, the federal court independently reviews the state court record to determine whether the state court's decision is objectively unreasonable. *Id.* at 802 (citing *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013)).

Finally, even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638-39 (1993) (internal

United States District Court
Northern District of California

quotation and citation omitted).  Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  *Id.* at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

## ANALYSIS

As noted above, this order addresses several subclaims presented in Claim 53 of the FAP. These subclaims are broadly characterized by Petitioner as juror misconduct claims, are predicated on allegations that various jurors improperly relied upon extraneous and impermissible information in rendering their verdicts, *see* FAP ¶ 1074, and are based on the following assertions: (1) a juror erroneously believed Petitioner had previously been convicted of the charges pending before the jury (Claim 53.A); (2) at least one juror prejudged the case and expressed concern that another juror might not vote to convict Petitioner (Claim 53.B); (3) jurors prematurely discussed the case and relied upon extrajudicial knowledge of an alternate juror who did not participate in deliberations (Claim 53.D); (4) guilt and penalty phase jurors improperly fraternized during the trial (Claim 53.E); (5) jurors improperly consumed alcoholic beverages during the trial (Claim 53.F); and (6) a juror improperly observed Petitioner in restraints during the trial (Claim 53.H).

### I.      Juror Misconduct: General Principles

"One of the most fundamental rights in our system of criminal justice is the right to trial before an impartial jury." *Godoy v. Spearman*, 861 F.3d 956, 958 (9th Cir. 2017).  In addition to the guarantee of an impartial jury, "trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. State of Louisiana*, 379 U.S. 466, 472-73 (1965) (internal quotation omitted).  The Ninth Circuit has recognized under the heading of "juror misconduct" several errors implicating these constitutional rights, including, as relevant here, juror bias and impermissible influence of jurors through improper third-party contacts or exposure to extrinsic evidence.  *See Estrada v. Scribner*, 512 F.3d 1227, 1238-40 (9th Cir. 2008).  Although all of these types of error may be grouped under a single heading, they are, as discussed below, analytically

United States District Court
Northern District of California

8

distinct and require proof of different elements.

### A.    Juror Bias

The Sixth Amendment guarantees a criminal defendant a trial by "a panel of impartial, 'indifferent' jurors. *Irwin v. Dowd*, 366 U.S. 717, 722 (1961). "The bias or prejudice of even a single juror is enough to violate that guarantee." *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000). "[T]he presence of a biased juror is a structural error, not subject to harmless error analysis," and, if one is found, the defendant is "entitled to a new trial." *Estrada*, 512 F.3d at 1235 (citation omitted). In this Circuit, three forms of juror bias have been recognized:

> (1) "actual bias, which stems from a pre-set disposition not to decide an issue impartially"; (2) "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury"; and (3) "so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire" where a truthful response "would have provided a valid basis for a challenge for cause."

*United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013) (quoting *Fields v. Brown*, 503 F.3d 755, 766-67 (9th Cir. 2007) (en banc)). "Actual bias" is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" *Estrada*, 512 F.3d at 1240. Actual bias is typically demonstrated by showing that a juror "dishonestly answered questions during voir dire" and/or "represented that he could judge the evidence fairly." *Id.* "Even where actual bias has not been demonstrated," however, a court may, in "extraordinary cases," find "implied bias". *Olsen*, 704 F.3d at 1191. In that regard, the Ninth Circuit has "recognized implied bias in only two contexts: first, in those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances, . . . and second, where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury." *Id.* at 1191-92 (internal quotations and citation omitted).

### B.    Impermissible Contacts and Extrinsic Evidence

Apart from identifying and excluding biased jurors, another "critical safeguard" in ensuring the Constitution's fair trial guarantee is "protecting the jury against improper influence

United States District Court
Northern District of California

from outside parties," *Godoy*, 861 F.3d at 958, and preventing, or mitigating, jurors'
"consideration of extraneous evidence during deliberations," *see Ripo v. Davis*, 971 F.3d 866, 881
(9th Cir. 2020); *see also, e.g., id.* (jurors' reading and discussion of Bible verses during
deliberations); *Henry v. Ryan*, 720 F.3d 1073, 1085 (9th Cir. 2013) (jurors' conducting out-of-
court experiment to test veracity of defendant's testimony and sharing results with other jurors).
As discussed below, these two forms of juror misconduct are, unlike juror bias, subject to a
harmless error inquiry.

### 1.    Impermissible Outside Contacts

"[W]hen faced with allegations of improper contact between a juror and an outside party,
courts apply a settled two-step framework" derived from the United States Supreme Court's
decisions in *Mattox v. United States*, 146 U.S. 140 (1892), and *Remmer v. United States*, 347 U.S.
227 (1954).  *Godoy*, 861 F.3d at 959

In *Mattox*, the Supreme Court reversed a district court's order denying a motion for a new
trial that was based upon juror affidavits establishing that, after the close of evidence, the bailiff
charged with securing the jury made prejudicial statements to jurors about the defendant's
criminal history and culpability as to the crimes for which he was charged.  146 U.S. at 143-44.
The affidavits also recounted that a newspaper article with prejudicial commentary about the case
was read to the jury during deliberations.  *Id.*  In assessing the circumstances presented, the
Supreme Court articulated the following rule with respect to examining extrajudicial influences on
a jury: "It is vital in capital cases that the jury should pass upon the case free from external causes
tending to disturb the exercise of deliberate and unbiased judgment. . . .Private communications,
possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are
absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to
appear." *Id.* at 149-50.  Hence, in establishing the early contours of a framework for examining
claims of improper influence, the Supreme Court announced two important criteria: where
improper contact with a juror is alleged, the extrajudicial contact or communication must at least
be "possibly prejudicial" and, in addition, such claims are subject to a harmlessness inquiry.

In *Remmer*, the Supreme Court again considered the denial of a motion for new trial based

10

United States District Court
Northern District of California

upon a claim of improper extrajudicial contact involving a juror.  Specifically, the defendant learned, after trial, that the jury foreman was approached at some point by an unknown person offering pecuniary gain to the juror in exchange for a verdict favorable to the defendant.  *Id.* 347 U.S. at 228.  When the juror first alerted the judge to this contact, the judge conferred with the prosecution and ordered the F.B.I. to investigate the allegation and prepare a report.  *Id.*  The report was made available only to the judge and the prosecution, with all involved apparently agreeing that the offer to the juror was made in jest and, therefore, no further inquiry was required.  *Id.*  After the trial, the defense learned about the incident and F.B.I. investigation through published media reports and moved for a new trial.  *Id.*  The judge declined to hold a hearing on the defendant's claim that he suffered prejudice and denied the motion for new trial.  *Id.* at 228-29.  Refining its *Mattox* holding, the Supreme Court held that, "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial," but such "presumption is not conclusive," and the Government bears the burden to "establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."  *Id.* at 229 (citing *Mattox*, 146 U.S. at 148-50).

Synthesizing these two decisions, *Godoy* articulates the *Mattox-Remmer* framework as follows:

> At step one, the court asks whether the contact was "possibly prejudicial," meaning it had a "tendency" to be "injurious to the defendant."  If so, the contact is "deemed presumptively prejudicial" and the court proceeds to step two, where the "burden rests heavily upon the [state] to establish" the contact was, in fact, "harmless."

861 F.3d at 959 (quoting *Mattox*, 146 U.S. at 150, and *Remmer*, 347 U.S. at 229).  "If the state does not prove harmlessness, the court sets aside the verdict[;][w]hen the presumption arises but the prejudicial effect of the contact is unclear, the trial court must hold a 'hearing' to 'determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial.'"  *Godoy* at 962 (quoting *Remmer*, 347 U.S. at 229-30).

The defendant's burden in establishing a presumptively prejudicial contact at step one is not onerous.  *Godoy*, 861 F.3d at 968.  A defendant "need only demonstrate a *credible* risk" of prejudice for the presumption to attach.  *Id.* (emphasis in original).  Nevertheless, not all claims of

United States District Court
Northern District of California

misconduct involving a juror's extrajudicial contact trigger a presumption of prejudice at step one. "[I]f an unauthorized communication with a juror is *de minimis*, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution." *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 696 (9th Cir. 2004). Because of the "practical impossibility of shielding jurors from all contact with the outside world," and because "not all such contacts risk influencing the verdict," merely "threadbare or speculative allegations of misconduct" are not sufficient to demonstrate "possibly prejudicial" contacts under the *Mattox-Remmer* framework. *Godoy*, 861 F.3d at 967 (internal quotations and citations omitted). Consequently, "prosaic" forms of misconduct, such as jurors' "chance contacts" with witnesses while passing in hallways or crowded together on elevators will not suffice at step one of the framework. *Id.* (internal quotations and citation). "[U]ndue contact between jurors and "government officers," however, "will almost categorically trigger the presumption." *Id.* (internal quotations and citations omitted).

Other factors relevant to a court's consideration of whether a contact raises a credible risk of prejudice include "the length and nature of the contact, the identity and role at trial of the parties involved, evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction." *Caliendo*, 365 F.3d at 697-98. The quality and character of the totality of the evidence introduced against the defendant—that is, whether the case is "close"—is another appropriate factor in assessing whether the presumption is triggered. *See id.* at 698 (finding, where only evidence of defendant's culpability for auto burglary was offered by detective who testified as to defendant's confession, detective's twenty-minute conversation with three jurors during break in deliberations was presumptively prejudicial; noting "the case was close enough that [defendant's] first jury hung"). Ultimately, at step one, the *Mattox-Remmer* framework requires a reviewing court to closely examine the "full context" of any alleged extrajudicial contact to determine whether it was improper and, even if so, whether surrounding circumstances show that it was "innocuous." *Godoy*, 861 F.3d at 968.

Where a contact triggers the presumption of prejudice, the Government, at step two of the *Mattox-Remmer* framework, must rebut such presumption by introducing "contrary evidence"

12

1    showing the contact was harmless. *Godoy*, 861 F.3d at 965. Drawing contrary inferences from

2    the same evidentiary source giving rise to the presumption of prejudice, e.g., a juror's declaration,

3    will not suffice. *Id.* Where there is insufficient information in the record to determine the

4    circumstances of the alleged contact or whether it was harmless, a court is required to hold a

5    hearing with both parties participating and at which the Government is held to its burden of

6    demonstrating harmlessness. *Id.* at 966. "The form of this hearing may vary, depending on what

7    is necessary to 'determine the circumstances [of the contact], the impact thereof upon the juror,

8    and whether or not it was prejudicial.'" *Id.* at 969 (quoting *Remmer*, 347 U.S. at 230). "If the state

9    fails to demonstrate the contact was harmless, the defendant's conviction is unconstitutional." *Id.*

10

11            **2.    Extrinsic Evidence**

12           The *Mattox-Remmer* framework as articulated in *Godoy* "constitutes clearly established

13    federal law for analyzing improper contacts between jurors and outside parties." *Von Tobel v.

14    Benedetti*, 975 F.3d 849, 854 (9th Cir. 2020). A jurors' exposure to and possible reliance upon

15    extrinsic evidence unrelated to any third-party contact, however, is not subject to the

16    burden-shifting framework outlined in *Godoy*. Instead, such claims have been tested against the

17    traditional harmless error standard set forth in *Brecht*. *See Kipp*, 971 F.3d at 881-82 (declining to

18    apply *Mattox-Remmer* framework to claim involving jurors' reliance on biblical passages during

19    deliberations; holding such error did not have a "substantial and injurious effect on the verdict").

20    *See also Espinoza v. Montgomery*, 816 F. App'x 217, 218 n.2 (9th Cir. 2020) (declining to apply

21    "two-step *Mattox-Remmer* framework" to claim alleging juror improperly visited crime scene and

22    disclosed observations to other jurors; finding such conduct constituted a "communication of

23    extrinsic facts, where [the Ninth Circuit] applies the *Brecht* harmlessness standard") (internal

24    quotation and citation omitted).

25           Where *Brecht* applies, it is not enough that a juror's alleged misconduct establishes a

26    "reasonable possibility" of harm; a petitioner is entitled to relief only if the federal court has

27    "grave doubt" about whether the alleged misconduct prejudiced the verdict. *Davis v. Ayala*, 576

28    U.S. 257, 268 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). In evaluating

United States District Court
Northern District of California

13

whether exposure to extrinsic evidence prejudiced the outcome of the trial, a federal court may consider various factors, including the following:

> (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Estrada*, 512 F.3d at 1238 (quoting *Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000)).

Among the other matters bearing on a court's determination as to prejudice is the overall strength of the case against the defendant. *See United States v. Montes*, 628 F.3d 1183, 1189 (9th Cir. 2011) (finding no prejudice resulting from juror's discussion of extrajudicial publication during deliberations, where "[o]verwhelming evidence of Appellants' guilt was introduced at trial"); *Hughes v. Borg*, 898 F.2d 695, 700 (9th Cir. 1990) (holding one way Government can demonstrate harmless error is "by showing that the other evidence amassed at trial was so overwhelming that the jury would have reached the same result even if it had not considered the extraneous material"). Similarly, the strength of aggravating evidence admitted in the penalty phase of a capital trial is an appropriate consideration in assessing whether extrinsic evidence prejudiced the jury's sentencing verdict. *See Kipp*, 971 F.3d at 882.

## II.     Petitioner's Claims of Error

Petitioner presents both general and specific challenges to the California Supreme Court's orders denying his claims of juror misconduct. He argues, generally, that the "California Supreme Court tests claims of juror misconduct and extraneous influence on jurors against a standard of prejudice . . . that is contrary to clearly established law." Docket No. 256 at 5. He also argues that each of his discrete claims of juror misconduct satisfies AEDPA's standard for a grant of relief. *Id.* at 19-25. The Court first discusses the relevant state court decisions before addressing Petitioner's general and specific challenges to those decisions.

### A.     The California Supreme Court's Orders Denying Petitioner's Claims

All of Petitioner's remaining juror misconduct claims were alleged in Claim 18 of Petitioner's first state habeas petition and then re-alleged in Claim 47 of his second state habeas

1   petition.  The California Supreme Court summarily denied those claims on the merits without

2   issuing a reasoned decision.  S*ee In re Carpenter*, No. S058191 (May 27, 1998); *In re Carpenter*,

3   No. S083035 (Dec. 1, 1999).  The parties thus agree that, for purposes of applying AEDPA, the

4   remaining juror misconduct claims were summarily denied by the California Supreme Court on

5   their merits in the course of state habeas corpus proceedings.  *See* Docket No. 254 at 2; Docket

6   No. 256 at 1-2.

7                              **B.      Asserted Application of Incorrect Standard.**

8          As noted, Petitioner first argues that the California Supreme Court "tests claims of juror

9   misconduct and extraneous influence on jurors against a standard of prejudice . . . that is contrary

10  to clearly established law."  Docket No. 256 at 5.  Petitioner does not, however, base such

11  argument on any portion of the summary orders denying his state habeas petitions in this case, but,

12  rather, on his reading of the California Supreme Court's opinion reversing a grant of habeas

13  corpus relief in his case arising from the Marin County charges.  *Id.* at 5-6 (citing *In re Carpenter*,

14  9 Cal. 4th 634 (1995)).  In that regard, he maintains, "[i]n the absence of evidence to the

15  contrary—and there is none here—a federal habeas court should assume that the state court, in

16  summarily denying the present case, applied the principles of law concerning prejudice from jury

17  misconduct that it set forth in its then-recent published precedential opinion on the same subject."

18  *Id.* at 6 (citing *Bell v. Cone*, 543 U.S. 447, 455-57 (2005), and *McKinney v. Ryan*, 813 F.3d 798,

19  826 (9th Cir. 2015) (en banc)).

20         This Court, without addressing Petitioner's underlying contention that the California

21  Supreme Court applied an incorrect standard when assessing prejudice in connection with juror

22  misconduct claims raised in another case, concludes Petitioner's argument here is unavailing.  In

23  general, AEDPA's deferential standard requires "that state-court decisions be given the benefit of

24  the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002), a principle exemplified by the standard

25  of review applicable to state court decisions that, like those at issue here, are not supported by a

26  reasoned opinion.  In particular, "[f]or claims that the California [Supreme Court] addressed only

27  in its summary denial, [this Court must] conduct an independent review of the record to determine

28  what arguments or theories . . . could have supported the . . . state court's decision."  *See Ayala v.*

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1   *Chappell*, 829 F.3d 1081, 1095 (9th Cir. 2016) (internal quotations and citations omitted).  This

2   Court is not charged with combing prior opinions of the California Supreme Court to discern

3   whether, historically, it had been applying constitutional law correctly.  Instead, this Court is, as

4   noted, required to give the California Supreme Court's decision under review the benefit of the

5   doubt and to "independently" review the record to determine whether any "argument" or "theory"

6   could have supported that decision; it is not permitted to indulge Petitioner's contention that,

7   because he perceives the state court to have applied an incorrect standard in previous opinions, the

8   state court applied an incorrect legal standard to the claims he raises here.

9          Petitioner's cited authorities do not suggest a different result.  Neither *Bell v. Cone* nor

10  *McKinney v. Ryan* addresses federal habeas review of a summary state court decision that does not

11  explicitly articulate a rationale in its resolution of a given claim.  Indeed, *Bell* pointedly cautions

12  against a federal court inferring a state court's erroneous application of federal law in the absence

13  of a clear indication of such in the relevant state court decision.  *See Bell*, 543 U.S. at 455 (holding

14  "[f]ederal courts are not free to presume that a state court did not comply with constitutional

15  dictates on the basis of nothing more than a lack of citation").  *McKinney*, likewise, is inapposite.

16  In that case, the Court of Appeals determined the Arizona Supreme Court had, in a reasoned

17  opinion, applied an "unconstitutional causal nexus test for nonstatutory mitigation," where the

18  Arizona Supreme Court, in making its own factual determination regarding the lack of a nexus

19  between the proffered nonstatutory mitigation evidence and the crime, not only recited in its

20  opinion the unconstitutional causal nexus test on which it relied but also favorably cited its prior

21  precedents establishing the test.  *See* 813 F.3d at 821.  In short, nothing in either *Bell* or *McKinney*

22  permits this Court to impute to the California Supreme Court's summary decisions in this case the

23  application of a purportedly unconstitutional standard articulated in a previous, unrelated opinion.

24          Accordingly, as required by AEDPA, the Court will examine each of Petitioner's claims of

25  juror misconduct and assess whether reasonable arguments or theories could have supported the

26  California Supreme Court's summary orders denying such claims.

27  ##

28  ##

United States District Court
Northern District of California

C.      **Petitioner's Specific Challenges.**

1.      **Claim 53.A**

Claim 53.A alleges that a juror, prior to hearing the guilt phase closing arguments, erroneously believed Petitioner had already been convicted in Santa Cruz County of the charges before the jury—in other words, that the Los Angeles trial was a retrial—and that said juror shared this information with at least one other juror.  FAP ¶ 1076.  Petitioner alleges that the two jurors' acquisition of this information and failure to report such acquisition to the trial judge constituted a "structural defect in the trial" and created "inherent prejudice which is incapable of measurement" and "not subject to harmless error analysis."  *Id.* at ¶¶ 1080-81.  He further alleges that these jurors' misconduct created a presumption of prejudice affecting both the guilt and penalty phases of his trial.  *Id.* at ¶ 1082.  Respondent argues that the California Supreme Court reasonably could have rejected this claim because Petitioner failed to plead allegations demonstrating how he was prejudiced by the first juror's receipt of erroneous information regarding a previous conviction.  Docket No. 254 at 4.

The evidentiary source of Claim 53.A, when it was presented to the California Supreme Court, was the declaration of guilt-phase alternate juror Marjorie Altman ("Altman"), who stated that an unidentified juror told her Petitioner "had been convicted of murder in the county where these crimes had happened," and that said unidentified juror had learned the information from "one juror [who] had overheard the judge talking to a witness about this in the hallway."  Altman Decl., Lodged Doc. C2, app. 114, ¶ 6.

Because Claim 53.A alleges that a juror's apparently incidental, out-of-court contact with a court official resulted in jurors' acquisition of prejudicial extraneous evidence of a prior conviction of Petitioner, the Court reviews the state court's decision denying this claim on the merits pursuant to the *Mattox-Remmer* framework as articulated in *Godoy*,[5] and, as set forth below, finds Petitioner has not shown the California Supreme Court's decision was contrary to or

---

[5] In applying the *Mattox-Remmer* framework to this claim, the Court rejects Petitioner's contention that Claim 53.A alleges a "structural defect" that is not subject to harmless error review.  *See* FAP ¶ 1081.

United States District Court
Northern District of California

1   an unreasonable application of clearly established federal law, or that it was based upon an

2   unreasonable determination of the facts.

3         At the outset, the state court reasonably could have determined this claim fails at the first

4   step of the *Mattox-Remmer* framework because it does not allege juror misconduct sufficiently

5   serious to trigger the presumption of prejudice.  Altman's declaration is lacking in detail, but there

6   is no indication that either the juror or the judge acted intentionally at the time of the contact in

7   question.[6]  At most, Petitioner has plausibly alleged only that an unidentified juror within

8   eavesdropping range misheard or misapprehended something said by the trial judge to someone

9   else in the hallway.  Moreover, the California Supreme Court could have declined to consider

10  whether the alleged contact was possibly prejudicial because the reported contact was implausible.

11  In particular, it is highly unlikely that a trial judge will be found loitering in a hallway and chatting

12  with witnesses within earshot of jurors, and it is even less likely that the trial judge here would be

13  discussing Petitioner's preceding murder conviction on the charges pending before the jury, in that

14  no such conviction—indeed, no such trial—had occurred.  *See Tarango*, 837 F.3d at 950

15  ("Certainly, there may be circumstances in which a trial court finds a juror's allegations of an

16  external contact are unsupported by sufficient evidence, or in which the allegations are so

17  implausible or incredible that they may be reasonably disregarded.").

18        Furthermore, the California Supreme Court reasonably could have concluded that, even if

19  the incidental contact described in Claim 53.A was presumptively prejudicial, such presumption

20  was conclusively rebutted, given the defense strategy at the guilt phase to concede Petitioner killed

21  Hansen and Scaggs and ask the jury to convict only of second degree murder or at least to refuse

22  to find true the special circumstance allegations necessary to proceed to the capital sentencing

23  phase.  Where the defense thus has openly advocated for a second degree murder conviction, there

24  is no credible risk that one or more jurors' erroneous belief in a prior murder conviction for the

25  same conduct prejudiced the outcome of the trial.[7]  *Cf. Caliendo*, 365 F.3d at 698 (finding, where

26   

27  [6] Although the alleged conveying of out-of-court information to Altman was improper, Altman, as noted, was an alternate and thus had no role in the verdict.

28  [7] Altman's declaration, which, as noted, is the sole evidentiary source for this claim, is illustrative.

case was close and first trial resulted in hung jury, improper and sustained contact between chief prosecution witness and jurors in second trial was presumptively prejudicial). Accordingly, the California Supreme Court, at step one of the *Mattox-Remmer* framework, reasonably could have determined the alleged contact described in Claim 53.A was not presumptively prejudicial.

Even if the California Supreme Court could not have reasonably rejected Petitioner's claim at step one of the *Mattox-Remmer* framework, however, it does not follow that Petitioner is entitled to relief. Were the California Supreme Court to have applied the presumption of prejudice in this instance, it nevertheless reasonably could have determined at step two of the *Mattox-Remmer* framework that such presumption was rebutted by the evidence in the case. Where the presumption of prejudice attaches, the *Mattox-Remmer* framework requires a court to "hold a hearing on prejudice if there is any remaining uncertainty about 'what actually transpired, or whether the incidents that may have occurred were harmful or harmless.'" *Godoy*, 861 F.3d at 969 (quoting *Remmer*, 347 U.S. at 229). As least one other circuit has noted, the "'most common means of demonstrating the harmlessness of an extraneous contact is to show the existence of overwhelming evidence of [the] defendant's guilt.'" *United States v. Scull*, 321 F.3d 1270, 1280 (10th Cir. 2003) (quoting *United States v. Davis*, 60 F.3d 1479, 1485 (10th Cir. 1995)). Here, for the reasons discussed above, the California Supreme Court, surveying the voluminous evidence of Petitioner's guilt and taking account of Petitioner's guilt phase closing argument, did not need to conduct a hearing to reasonably determine that the trial record dispels any uncertainty about whether the alleged contact described by Altman was harmful. Accordingly, even if Petitioner were entitled to the presumption of prejudice, the California Supreme Court reasonably could have rejected his claim at step two of the applicable *Mattox-Remmer* framework.

### 2.     Claim 53.B

In Claim 53.B, Petitioner alleges a juror expressed his or her concern that another juror "might screw things up" by voting to acquit Petitioner due to that juror's religion. FAP ¶ 1083.

---

In Altman's view, "[t]he whole thing seemed like a waste because the defense lawyer told us in his summation that Mr. Carpenter was out of control and had done it; [i]t was obvious to me that the defense lawyer knew this all along and planned to say this in his summation, so it was a waste to have the jurors go through the whole trial." Altman Decl., Lodged Doc. C2, app. 114, ¶ 6.

1  Petitioner alleges this remark demonstrates that the "juror had prejudged the case by concluding

2  that a verdict of not guilty amounted to 'screw[ing] things up." *Id.* He also alleges that this

3  juror's remarks violated the trial judge's instructions not to prejudge the case or to discuss issues

4  surrounding the trial prior to deliberations and, therefore, prejudiced the outcome of his trial. *Id.*

5  ¶¶ 1085-87.

6        The evidentiary source for Claim 53.B as presented in the state court was, again, the

7  declaration of alternate juror Marjorie Altman. In her declaration, Altman described a female

8  juror who did not socialize with other jurors and who carried a Bible with her during the trial.

9  According to Altman, another juror stated he/she feared this juror "might screw things up and vote

10  'not guilty' because of her religion, but that didn't happen." Altman Decl., Lodged Doc. C2, app.

11  114, ¶ 5. The declaration does not reveal anything about the identity of the juror alleged to have

12  prejudged the evidence, e.g., whether he or she was a deliberating or alternate juror at the guilt or

13  penalty phase, or even specify that this juror's remark occurred prior to the case being submitted

14  to the jury.

15        Although the petition broadly describes Claim 53's several subclaims as challenging

16  jurors' "multiple instances of misconduct permitting their deliberations and verdicts to be

17  influenced by impermissible and extraneous information," FAP ¶ 1074, Claim 53.B does not

18  appear to rest on any allegation of a juror's acquisition and use of or reliance upon impermissible

19  or extraneous information. Instead, the claim appears to allege simply that, at some point during a

20  very long trial, a juror expressed a concern that another juror might base her verdict on

21  impermissible and extraneous considerations, namely, her religion. While Petitioner, in his

22  petition, does not allege this juror's purported prejudgment constitutes or is the product of juror

23  bias, he does, in his brief, characterize the claim as alleging bias on the part of the purportedly

24  prejudging juror. *See* Docket No. 256 at 21 (quoting *United States v. Hayat*, 710 F.3d 875, 885

25  (9th Cir. 2010) (rejecting claim of actual bias)). As discussed earlier herein, the difference is

26  important, for the reason that "[t]he presence of a biased juror," unlike a juror's reliance on

27  extrinsic information, "is a structural error not subject to harmless error analysis," and, if one is

28  found, the defendant is "entitled to a new trial. *Estrada*, 512 F.3d at 1236. Hence, while the bulk

20

of Petitioner's claims alleging juror misconduct based on improper contacts or acquisition of extrinsic information do not allege structural defects in the trial and thus are examined for prejudice in the context of surrounding circumstances, Claim 53.B, to the extent it arguably alleges the presence of a biased juror, presents a different type of juror misconduct claim requiring a different analysis. *See Id.*; s*ee also Grotemeyer v. Hickman*, 393 F.3d 871, 877 (9th Cir. 2004) (noting allegations of prejudicial misconduct consisting of improper consideration of extrinsic information and actual bias are analytically distinct; noting "the requirements as to prejudice are different").

Ultimately, Petitioner's minimal allegations regarding the juror at issue in Claim 53.B do not support a claim of a biased juror under any theory of juror bias recognized by the Court of Appeals, whether characterized as actual, implied, or "*McDonough*-style." *See Olsen*, 704 F.3d at 1189. No allegation in Claim 53.B supports a theory that the relevant juror harbored actual bias against Petitioner, i.e., that the juror was unable to judge the evidence adduced in court impartially, much less that such juror willfully concealed any ability to do so during voir dire, or that any other circumstances are indicative of bias. Accordingly, to the extent Petitioner intended to allege his trial was tainted by a biased juror, the California Supreme Court reasonably could have determined his allegations were insufficient to state a claim of such structural error.

To the extent Petitioner intended to allege only that the juror's purported prejudgment constitutes some form of trial error that, while not based on the juror's acquisition and reliance on impermissible and extraneous information, nevertheless constitutes a cognizable form of juror misconduct, such claim likewise fails, as it is evident any error was harmless. Petitioner has plausibly alleged, at most, that an unidentified juror was concerned that another juror might vote to acquit Petitioner based upon that juror's apparent religious convictions. Were a juror to vote to acquit Petitioner because of that juror's religious beliefs, such decision, as the product of improper extrinsic evidence, could fairly, if colloquially, be described as "screw[ing] things up." To the extent a juror might be deemed to have acted improperly in expressing this sentiment in the company of other jurors, no "grave doubt" exists about whether such alleged misconduct prejudiced the jury's verdict, *see Davis*, 576 U.S. at 268, given the overwhelming evidence of

1  Petitioner's guilt and the defense's strategic concessions.

2  ### 3.  Claim 53.D

3  Claim 53.D alleges jurors "improperly conversed among themselves, and with alternate

4  jurors, concerning the case prior to their deliberations, resulting in the verdict being tainted by the

5  extrajudicial personal knowledge of an alternate juror."  FAP ¶ 1091.  Specifically, Petitioner

6  alleges, the following events constitute such misconduct: penalty phase alternate juror David

7  Coupe ("Coupe") shared his personal knowledge about firearms and the Santa Cruz parks where

8  Hansen and Scaggs were murdered (*id.* at ¶ 1092); penalty phase alternate juror Donald Richmond

9  ("Richmond") regularly discussed the case with a guilt phase juror during trial (*id.* at ¶ 1094); the

10  alleged prejudging juror described in Claim 53.B impermissibly discussed the case prematurely

11  when relaying his/her concern about the religious juror (*id.* at ¶ 1096); and alternate juror Altman

12  intercepted Petitioner's confidential communications with counsel through her professed ability to

13  read lips (*id.* at ¶ 1099).  According to Petitioner, these incidents of alleged misconduct, as both

14  improper pre-deliberation discussions among jurors and exposure to extraneous information,

15  deprived him of a fair trial and prejudiced the outcome of the guilt and penalty phases of his trial.

16  *Id.* at ¶ 1100.

17  Because Claim 53.D's disparate subclaims rely upon discrete factual allegations and

18  evidentiary sources, each will be addressed separately.

19  ### a.  Alternate Juror Coupe

20  When presented in the state court, the evidentiary source for Petitioner's allegations

21  regarding the conduct of alternate juror Coupe was Coupe's declaration, in which he states as

22  follows:

23  During the questioning by the judge and lawyers, I mentioned I was familiar with
the parks where the crimes took place.  I used to go camping there every summer
with my family.  This was very helpful during the trial because the other jurors
24  remembered my saying this and asked me questions about the terrain, which I
answered.  Most of the jurors were from the city so it was hard for them to
25  understand what the wooded area was like.  After we heard testimony about how
the victim's body was found in the woods, guilt and penalty phase jurors asked me
26  questions about whether the area was really secluded and whether there were
animals in the area.  I was also able to tell jurors the distances between the towns
27  the witnesses testified about.

28  Coupe Decl., Lodged Doc. C2, app. 115, ¶ 4.  Coupe also states:

United States District Court
Northern District of California

1

> A woman in a Navy uniform testified that Mr. Carpenter had shown her how to use a gun. Her testimony was very confusing. She mixed up all the parts of the gun. This surprised me because she was in the Navy. Since the jurors had heard me say that I knew about guns, they asked me questions, and I explained how the witness was confused. I helped them understand how the gun really worked.

4   *Id.* at ¶ 6.

5           The California Supreme Court reasonably could have found Coupe's alleged conduct—

6   answering other jurors' questions based upon his own personal knowledge of general subjects like

7   geography, local flora and fauna, and firearm operation—is not inherently improper.  *See*

8   *Grotemeyer*, 393 F.3d at 877-78 (distinguishing juror's "sharing her own experiences [as

9   physician] with her colleagues on the jury" from improper introduction of extrinsic evidence such

10  as "legal research" or results of juror's experiment).  In other words, the mere fact that a juror

11  might bring his or her "outside experience to bear on the case is not sufficient" to implicate a

12  constitutional violation, as the "Sixth Amendment entitles a defendant to an 'impartial' jury, not to

13  an ignorant one."  *Id.* at 879.  For this reason, courts have repeatedly rejected juror misconduct

14  claims premised on a juror's inserting during deliberations his or her personal knowledge or

15  experience, even where it pertains to matters reserved for expert testimony.  *See, e.g., id.* (finding

16  no constitutional violation where foreperson, in assessing defendant's moral culpability, expressed

17  opinion based on her experience as physician); *United States v. Budziak*, 697 F.3d 1105, 1111 (9th

18  Cir. 2012) (finding no misconduct where, in child pornography case, several "computer savvy"

19  jurors, in speculating about "the lack of forensic evidence of distribution," relied upon their own

20  "personal life experiences with computers and the [peer-to-peer file-sharing] program" at issue).

21          Moreover, as discussed below, to the extent Coupe's communication of extrinsic facts

22  about geography or firearms should be treated as misconduct, the California Supreme Court

23  reasonably could have found any error harmless in light of the overwhelming evidence of guilt and

24  defense counsel's concessions.  In other words, the state court reasonably could have determined

25  any error was harmless because the "evidence amassed at trial was so overwhelming that the jury

26  would have reached the same result even if it had not considered the extraneous material."  *See*

27  *Hughes*, 898 F.2d at 700.

28          First, even crediting Petitioner's claim that Coupe's declaration shows jurors discussed the

United States District Court
Northern District of California

23

case prior to deliberations, he still must provide allegations demonstrating such discussions prejudiced the outcome of his trial and denied him a fair trial. *See United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974). The mere allegation that jurors prematurely discussed evidence is insufficient, on its own, to sustain a claim of constitutional error. *See Belmontes v. Brown*, 414 F.3d 1094, 1124-25 (9th Cir. 2005) (holding "[a] petitioner must allege facts which, if proved, would show that the premature deliberations prejudiced him to the extent that he did not receive a fair trial") (citation omitted), *reversed on other grounds*, *Ayers v. Belmontes*, 549 U.S. 7 (2006). Here, the California Supreme Court reasonably could have determined Petitioner failed to allege any facts establishing the requisite prejudice. Nothing in the petition or in Coupe's declaration supports a claim that any jurors, before the case was submitted to them, decided Petitioner's guilt or innocence based on their conversations with Coupe. Nor are there any credible allegations that any premature discussions involving Coupe prejudiced the outcome of Petitioner's trial on the ground that the information provided was material to the jury verdict at either the guilt or penalty phase of Petitioner's trial.

Further, to the extent Coupe's status as an alternate juror may have required the California Supreme Court to treat his interactions with jurors as impermissible third-party contacts subject to a *Mattox-Remmer* analysis, the state court, for the reasons discussed earlier herein, reasonably could have denied this claim. At step one of the framework, in considering the circumstances surrounding Coupe's discussions with jurors, the state court reasonably could have concluded Petitioner's allegations about jurors' contact with Coupe failed to establish any credible risk of prejudice to the verdict. As described above, there are no allegations in the petition plausibly alleging how either jury's verdict could have been influenced by the information provided by Coupe. Nor does Coupe's status as an alternate juror substitute for this lack of apparent materiality. Coupe was not a court official, witness, or other individual upon whom jurors might confer undue authority. Petitioner's claim of prejudice is thus no more than speculative and, consequently, is insufficient to establish a presumptively prejudicial contact. *Godoy*, 861 F.3d at 967. Moreover, the overwhelming evidence of guilt and the defense strategy outlined previously further establish that the jurors' contacts with Coupe posed no credible risk to the verdict and that,

1    at step two of the framework, even if the presumption of prejudice applies, any error was plainly

2    harmless. *See supra* pp. 19-20.

3                          **b.    Alternate Juror Richmond**

4          The evidentiary source for Petitioner's claim regarding alternate juror Richmond, as

5    presented in the state court, is Richmond's declaration, wherein he conveys that he was selected as

6    a penalty phase alternate juror and that he developed a friendship with another juror over the

7    course of the trial.  Richmond Decl., Lodged Doc. D1, app. 121, ¶¶ 1, 8.  Richmond avers that he

8    and his juror friend discussed their "families, friends, and the case," and "seemed to agree point by

9    point on the evidence." *Id.* at ¶ 8.  Richmond appreciated having someone to talk to "because of

10   the kind of evidence [they] saw, especially the pictures." *Id.*

11         The California Supreme Court reasonably could have determined Petitioner failed to plead

12   any prejudice owing to Richmond's conversations with his juror friend.  Notably, unlike with

13   alternate juror Coupe, there is no allegation that Richmond shared or discussed with his friend any

14   extraneous information.  Instead, it is alleged only that Richmond and his friend discussed the

15   evidence prematurely.  As discussed above, jurors' premature discussions of aspects of the case,

16   even if contrary to the judge's instructions, are not alone sufficient to sustain a claim of a

17   constitutional violation. *Belmontes*, 414 F.3d at 1124-25.  There must be some allegation

18   supporting a claim of prejudice to Petitioner's right to a fair trial. *Klee*, 494 F.2d at 396.  In that

19   regard, Richmond's declaration "does not assert that any of the jurors relied upon any evidence

20   outside of the record in reaching their verdict, nor does it assert that any of the jurors actually

21   decided the defendant's guilt before the case was submitted to them." *Id.*  Rather, Petitioner

22   merely alleges that Richmond regularly discussed the case with a guilt phase juror and that,

23   according to Petitioner, it is probable that these discussions tainted the jury's verdict.  FAP ¶¶

24   1094-95.  The California Supreme Court reasonably could have determined this allegation was

25   speculative and insufficient to state a plausible claim of prejudice.

26         To the extent Richmond's status as an alternate juror may have required the California

27   Supreme Court to treat his interactions with his juror friend as impermissible third-party contacts

28   subject to a *Mattox-Remmer* analysis, the state court, for the reasons described earlier herein,

United States District Court
Northern District of California

25

could have justifiably denied this claim.  At step one of the framework, the state court reasonably could have concluded Petitioner's allegations about Richmond's interactions with his juror friend are too vague and speculative to establish a credible risk of prejudice to the verdict.  *Godoy*, 861 F.3d at 967.  There are no allegations in the petition plausibly alleging how the verdict could have been influenced by their conversations.  Moreover, the overwhelming evidence of guilt and the defense strategy outlined previously further make clear that Richmond's interactions with his friend posed no credible risk to the verdict and, at step two of the framework, i.e., even if the presumption of prejudice applies, any error was plainly harmless. *See supra* p. 19.

### c.     Alternate Juror Altman

Claim 53.D presents two additional allegations respecting alternate juror Altman, namely, that her conversation with the juror concerned about another juror's religious convictions reflects an impermissible premature discussion of the case (FAP ¶ 1096) and that her failure to disclose to the trial judge that she was able to read Petitioner's lips when he spoke with his attorneys violated Petitioner's right to the assistance of counsel (FAP ¶ 1099).

The California Supreme Court reasonably denied these claims.  As discussed above, the mere fact that jurors may have prematurely discussed the case is insufficient to establish prejudice to a defendant's right to a fair trial.  Here, Petitioner does not allege that the juror described by Altman considered evidence outside of the record and any contention that such juror "actually decided the defendant's guilt before the case was submitted to them," *see Klee*, 494 F.2d at 396, is not supported by Altman's declaration.  Rather, as discussed earlier herein, this juror allegedly expressed concern that another juror might be inclined to acquit Petitioner because of religious convictions.  The California Supreme Court reasonably could have determined Petitioner's allegation regarding the premature discussion comprising such reported conversation is insufficient to state a claim of prejudicial juror misconduct.  *See Belmontes*, 414 F.3d at 1124-25.

Likewise, the California Supreme Court reasonably could have determined Petitioner's allegation regarding Altman's lip reading failed to state any claim of prejudicial jury misconduct.  Indeed, Petitioner's allegation with respect to Altman's lip reading is wholly conclusory.  There is no allegation of what communications, specifically, Altman intercepted.  Nor are there any

United States District Court  
Northern District of California

allegations that Altman, who did not deliberate as to Petitioner's guilt or sentence, shared any intercepted communications with other jurors, much less that such communications somehow influenced the jury's verdict at guilt or sentencing.

### 4. Claim 53.E

Claim 53.E alleges improper fraternization between members of the guilt and penalty phase juries tainted the verdicts of both juries.  In that regard, Petitioner alleges, "[m]embers of the two juries would intermingle and converse in the hallways during recesses, discussing witnesses in the trial."  FAP ¶ 1103.  In support of this claim, Petitioner relies upon the allegations of improper premature discussions described in Claim 53.D, including allegations that penalty phase alternate juror Coupe frequently lunched with guilt phase jurors and that penalty phase alternate juror Richmond became friends with a guilt phase juror with whom he regularly discussed trial evidence.  *Id.*  Petitioner alleges such fraternizing between members of the separate juries, including their premature discussions of the case, "compromised the separation of functions between the two juries, thereby violating" his constitutional rights to due process, an impartial jury, and a reliable determination of his sentence.  FAP ¶ 1105.

For the reasons discussed earlier herein, the California Supreme Court reasonably could have determined Petitioner failed to allege any cognizable claim of prejudice predicated on alleged improper fraternization.  The fact that guilt and penalty phase jurors might have intermingled and fraternized, and even prematurely discussed elements of the case, in disregard of the trial judge's orders, is insufficient to establish a viable claim of misconduct.  *See Belmontes*, 414 F.3d at 1124-25.  Petitioner still must plead some allegation permitting a reasonable inference that he was prejudiced by such conduct and thereby deprived of a fair trial.  *Klee*, 494 F.2d at 396.  Because there are no credible allegations that any fraternizing caused jurors to consider impermissible extrinsic evidence or to arrive at premature verdicts at either phase of the trial, Petitioner's allegations are insufficient to raise a credible claim of prejudice.  Accordingly, the California Supreme Court reasonably could have determined Petitioner's claim of improper juror fraternization is without merit.

To the extent Claim 53.E alleges fraternization between guilt and penalty phase jurors

constituted error beyond premature discussions of evidence or deliberations because it "compromised the separation of functions between the two juries," FAP ¶ 1105, Petitioner likewise is not entitled to relief.  There is no clearly established federal law requiring the impaneling of separate guilt and penalty phase juries and the maintenance of an impenetrable wall between such juries during a capital trial.  Petitioner's trial counsel requested this novel procedure to keep the jury charged with deciding guilt or innocence from being exposed to potentially prejucicial information that might be raised during the "death qualification" of jurors for the possible penalty phase but would not be admitted during the guilt phase. CT 3456-59.  None of Petitioner's allegations about improper fraternization between the guilt and penalty phase jurors suggest that this remedial purpose was compromised.  That is, there are no allegations that penalty phase jurors relayed possibly prejudicial information they may have learned in the penalty phase voir dire to guilt phase jurors.  The California Supreme Court thus reasonably rejected this claim. Furthermore, under *Brecht*, any error was, for the reasons previously stated, clearly harmless. Given the overwhelming evidence of Petitioner's guilt, as well as the overwhelming aggravating evidence introduced in the penalty phase, and the innocuous specific allegations of jurors' assertedly improper fraternizing, no "grave doubt," *Davis*, 576 U.S. at 268, exists about whether any fraternization between members of the guilt and penalty phase juries had a "substantial and injurious effect or influence in determining" either jury's verdict, *Brecht*, 507 U.S. at 623.

### 5.    Claim 53.F

In the portion of Claim 53.F that is not procedurally defaulted, Petitioner alleges members of the guilt and penalty phase juries consumed alcohol during their lunch breaks.[8]  FAP ¶ 1107. Petitioner further alleges consumption of alcoholic beverages is misconduct that creates a presumption of prejudice and had a substantial and injurious effect on the guilt and penalty phase

---

[8] The Amended Petition additionally alleges that one of the drinking jurors "often fell asleep in the jury box after lunch." FAP ¶ 1107.  This allegation of fact was not presented in Petitioner's first state habeas petition and, accordingly, was found untimely by the California Supreme Court when it denied his second state habeas petition.  In light of the state court's finding of a procedural bar, this Court found Petitioner's allegation about the sleeping juror procedurally defaulted.  *See* Docket No. 244 at 6.

United States District Court
Northern District of California

verdicts at his trial.  FAP ¶ 1109.  The evidentiary source for this claim when it was presented to the state court is the declaration of penalty phase alternate juror Coupe, who stated that "[s]ometimes after lunch [he] could smell alcohol on a couple of the other jurors, including a heavy set African-American man."  Coupe Decl., Lodged Doc. C2, app. 115, ¶ 2.

The California Supreme Court reasonably rejected this claim.[9]  In general, a defendant is entitled to be tried by mentally competent jurors.  *Jordan v. Commonwealth of Massachusetts*, 225 U.S. 167, 176 (1912) (holding "[d]ue process implies a tribunal both impartial and mentally competent to afford a hearing").  Here, apart from his procedurally defaulted allegation that one juror sometimes slept in the jury box due, purportedly, to such juror's alcohol consumption, Petitioner has provided no cognizable allegation that any juror was rendered incompetent by his or her alleged alcohol consumption.  He alleges only that, because Coupe sometimes smelled alcohol on the breath of "a couple" of jurors, some jurors sometimes drank during their lunch breaks.  Petitioner has not alleged any facts demonstrating alcohol consumption in an amount from which an inference might be drawn that a juror, or any of them, was so intoxicated that Petitioner was deprived of a fair trial.  As Respondent argues, there is no clearly established federal law forbidding the consumption of alcohol by jurors during trial, nor is there any clearly established federal law that a presumption of prejudice attaches upon the mere allegation that jurors sometimes consumed alcohol during their lunch breaks.  *See Tanner*, 483 U.S. at 125-26.)  The California Supreme Court thus reasonably could have rejected Petitioner's claim regarding alcohol consumption by jurors as insufficient to state any federal constitutional violation.

### 6.    Claim 53.H

The final claim of juror misconduct before the Court is Claim 53.H's allegation that a penalty phase juror may have observed Petitioner in the hallway in handcuffs at some point during

---

[9] In so finding, the Court need not reach Respondent's argument that, pursuant Rule 606(b) of the Federal Rules of Evidence, Petitioner has failed to proffer any competent evidence in support of this claim of juror misconduct.  *See* Docket No. 254 at 14.  The Court nonetheless notes that, as the United States Supreme Court previously has observed, Congress specifically rejected an interpretation of Rule 606(b) "that would have allowed jurors to testify on . . . juror intoxication." *See Tanner v. United States*, 483 U.S. 107, 125 (1987).

1    the trial.  *See* FAP ¶ 1114.[10]  The evidentiary source for this claim when presented in the state

2    court was the declaration of penalty phase deliberating juror Jean Pike ("Pike"), who, in describing

3    Petitioner's appearance and demeanor at trial, stated: "I think I remember seeing Mr. Carpenter in

4    the hallway in handcuffs."  Pike Decl., lodged doc. C2, app. 120, ¶ 5.

5           Although the amended petition describes Pike's possible observation of Petitioner in

6    handcuffs as a form of juror misconduct, there is no allegation of any misconduct on the part of

7    Pike by reason of her having observed Petitioner in the hallway.  There is no allegation, for

8    example, that Pike was in a location where she was not permitted to be or that she improperly

9    sought to observe Petitioner in the hallway.  Ordinarily, a juror's observation of a defendant in

10   restraints is reviewed as a due process claim, *see, e.g., Deck v. Missouri*, 544 U.S. 622 (2005),

11   rather than pursuant to the *Mattox-Remmer* framework for examining a claim of improper third-

12   party juror contacts or juror misconduct premised on a juror's consideration of extraneous

13   evidence.  In any event, no matter how the claim is construed as a matter of federal constitutional

14   law, the California Supreme Court reasonably could have denied it on its merits because Petitioner

15   failed to plead facts demonstrating the requisite prejudice.

16          First, under the rubric of juror misconduct by which this claim has been presented, there is

17   no factual allegation giving rise to a presumption of prejudice.  To the extent Pike's possible

18   observation of Petitioner may constitute some sort of improper "contact" under the *Mattox-*

19   *Remmer* framework, Petitioner alleges nothing more than the "prosaic" sort of misconduct, a

20   chance encounter, that is insufficient to give rise to a presumption of prejudice, given the

21   "practical impossibility of shielding jurors from all contact with the outside world."  *See Godoy*,

22   861 F.3d at 967 (citations omitted).  Pike's vague and equivocal statement that she thinks she

23   remembers seeing Petitioner in handcuffs in the hallway can hardly be characterized as describing

24   a lengthy, vivid, or even memorable, contact that might imply potential prejudice.  Consequently,

25   the California Supreme Court reasonably could have deemed such contact *de minimis* and, given

26

27   ───────────────────────
     [10] Another alleged instance of a juror observing Petitioner in handcuffs, this time seated at counsel
28   table (FAP ¶ 1113), was procedurally defaulted because the state court found it  was not timely
     presented in Petitioner's second state habeas corpus petition.  *See* Docket No. 244 at 6.

United States District Court
Northern District of California

the absence of any allegation about the impact of this contact on Pike's or other jurors' interpretation of the evidence, as well as the submission of voluminous evidence of guilt and aggravation already discussed, it reasonably could have determined Petitioner failed to allege any claim of juror misconduct for which a presumption of prejudice would attach under the *Mattox-Remmer* framework.

Relevant case law governing the more common type of constitutional claim implicated by a juror's observation of the defendant in restraints during trial, namely, a due process claim, supports the above finding.  Although, as the Supreme Court held in *Deck*, "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination . . . that they are justified by a state interest specific to a particular trial," *Deck*, 544 U.S. at 629 (internal quotation and citation omitted),[11] and although the Supreme Court deemed a juror's observation of a defendant in restraints during the guilt or penalty phase "inherently prejudicial," *see id.* at 635 (internal quotation and citation omitted), *Deck*, as the Ninth Circuit has observed, "concerned visible shackling *in the courtroom.*" *Wharton v. Chappell*, 765 F.3d 953, 964 (9th Cir. 2014) (emphasis in original).  The Ninth Circuit has held "visible shackling outside the courtroom—at least when the viewing is brief and accidental—is not inherently prejudicial," *see id.* (holding "due process violation occurs only if the criminal defendant demonstrates actual prejudice"). The reason for this distinction is an acknowledgement that "even the most unsophisticated juror" knows that some defendants, although presumed innocent, lack the resources to post bail or otherwise secure their release pending trial, and that it is a "normal and regular" practice to use restraints when transporting individuals from custodial facilities to the courtroom.  *Id.* at 965 (internal quotations and citations omitted).

No allegation in the petition or averment in Pike's declaration supports a claim that Pike's possible viewing of Petitioner in handcuffs in the hallway was anything more than brief or accidental.  Nor is there any allegation that this observation, resonated with Pike or was conveyed

---

[11] An important justification for such rule at the guilt phase is the need to avoid undermining the presumption of innocence, *see id.* at 630-31, and, at the penalty phase, a recognition that restraints tend to imply an officials' belief that the defendant is a danger to the community, *see id.* at 633.

United States District Court
Northern District of California

to other jurors such that it possibly influenced the outcome of Petitioner's trial.  Under such circumstances, the California Supreme Court was not obliged to presume the incident was "inherently" or "presumptively" prejudicial.  *See Wharton*, 765 F3d. at 964-65; *see also United States Olano*, 62 F.3d 1181, 1190 (9th Cir. 1995) (holding, "[b]ecause a jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant, [the defendant] must demonstrate actual prejudice to establish a constitutional violation") (internal citation omitted).  Because Petitioner failed to allege any fact regarding Pike's observation from which actual prejudice might reasonably be inferred, the California Supreme Court reasonably could have determined Petitioner failed to plead any claim of a federal constitutional violation deserving of further inquiry.

Lastly, to the extent this claim alleges juror misconduct consisting of Pike's acquisition of extrinsic evidence unrelated to an impermissible third-party contact, the overwhelming aggravating evidence admitted in the penalty phase makes clear no "grave doubt," *Davis*, 576 U.S. at 268, exists about whether Pike's possible observation of Petitioner had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623, at either phase of the trial.

## CONCLUSION

For the foregoing reasons, to the extent they have not previously been adjudicated as procedurally defaulted, Claims 53.A, 53.B, 53.D, 53.E, 53.F, and 53.H in Petitioner's First Amended Petition are hereby DENIED.  Within 60 days of the date of this Order, the parties shall file a proposed briefing schedule for Petitioner's Group Six claims.

**IT IS SO ORDERED.**

Dated:  December 15, 2023

MAXINE M. CHESNEY
United States District Judge

32